863 A.2d 926

**Edna O. ROURKE, as Personal Representative for the Estate of Franklin Adams, et al.**

v.

**AMCHEM PRODUCTS, INC., et al.**

**No. 130 Sept. Term, 2003.**

Court of Appeals of Maryland.

Dec. 14, 2004.

330

William F. Mulroney (David M. Layton of Ashcraft & Gerel, L.L.P., on brief), Baltimore, for Petitioners.

Ronald B. Rubin (Michael A. Stodghill of Rubin & Rubin, Chartered, Rockville, MD; R. Thomas Radcliffe, Jr. of DeHay & Elliston, L.L.P., Baltimore, MD; William F. Sheehan, Richard M. Wyner, Richard L. Matheny, III, and Matthew J. Wilshire of Shea & Gardner, Washington, DC), all on brief, for Respondents.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, Judge.

This case arises from a consolidated settlement of several hundred asbestos-related personal injury and wrongful death actions. The issue before us is whether the dispute that emanated from the settlement agreement and that forms the basis of this lawsuit is subject to arbitration, and that, in turn,

depends in part on whether we are required to give full faith and credit or common law collateral estoppel effect to a judgment of the Supreme Court of Virginia involving none of the plaintiffs and only three of the thirteen defendants in this case. The Circuit Court for Baltimore City concluded that it would not apply the doctrine of offensive non-mutual collateral estoppel based on that judgment, and that, under Maryland and Federal law, the dispute was subject to arbitration. Upon those conclusions, the court granted a motion to compel arbitration. The Court of Special Appeals, addressing as well the issue of full faith and credit, affirmed that ruling, *Rourke v. Amchem*, 153 Md.App. 91, 835 A.2d 193 (2003), and so shall we.

## BACKGROUND

In September, 1988, a number of asbestos manufacturers that had been named as defendants in multiple lawsuits pending in several States entered into a Producer Agreement Concerning Center For Claims Resolution. Among other things, that agreement created a non-profit entity known as the Center for Claims Resolution (CCR), to act as a claims agent with respect to all asbestos-related claims made against the participating members. Each participating member designated CCR as its sole agent to administer, evaluate, settle, pay, and defend such claims. The agreement required CCR to handle each claim on behalf of all members and precluded it from settling a claim on behalf of fewer than all members. We were apprized at oral argument, apparently as a result of that requirement, that, whenever CCR settled a claim, it obtained a release of all participating members, even those who had not been named as defendants in the particular case.

Attachment A to the Producer Agreement apportioned among the members their respective shares of three categories of expenses—liability payments (sums paid in settlement of asbestos-related claims or in satisfaction of judgments on such claims), allocated expenses, and unallocated expenses (overhead, administrative, and operating expenses of CCR). The Attachment anticipated the prospect of new members

joining CCR and current members terminating their membership, and it made provision for reducing apportioned shares when new members were admitted and increasing shares when members withdrew.[1]

Article III of the Producer Agreement permitted termination of membership in CCR only by (1) voluntary termination upon 60 days notice and a determination by the CCR Board of Directors that the withdrawing member had paid or made provision for the payment of all amounts due from it under the Agreement; (2) filing for bankruptcy protection or other protection from creditors under Federal or State law; or (3) action of the Board of Directors if a member was involuntarily placed in bankruptcy or was determined to be insolvent or if the Board found that the member had materially breached the Agreement. Article III further provided, however, that, notwithstanding termination of membership, the terminated member "shall continue to have and to honor all of the obligations incurred by it hereunder or on its behalf as a member prior to the effective date of its membership termination...."

In April, 2000, two law firms that represented 882 plaintiffs with asbestos-related personal injury or wrongful death claims pending in Maryland courts entered into a global settlement of those claims with CCR which, at the time, had 16 members.[2]

---

1. Paragraph F of Attachment A provided, in relevant part: "In the event the Producer becomes a signatory, the corresponding shares of the other Participating Producers shall be reduced appropriately to make room for the shares of the new Participating Producer. In the event that a Participating Producer shall withdraw from membership in the Center pursuant to Section IV of the Agreement or have its membership terminated pursuant to Paragraph 3 of Section III, the corresponding shares of the other Participating Producers shall be increased appropriately to pick up the shares of the withdrawing or terminating Participating Producer."

2. The actual parties to the agreement, other than CCR, were William F. Mulroney, David M. Layton, and Joseph F. Rice, individually and as agents for their respective law firms, Ashcraft & Gerel and Ness, Motley, Loadholt, Richardson & Poole, as agents for the plaintiffs presently represented or that may in the future be represented by those firms in asbestos personal injury litigation in Maryland.

There were five categories of plaintiffs—those with mesothelioma (5), those with lung cancer (29), those with other cancer (20), those with non-malignant I diseases (essentially asbestosis or significant bilateral pleural thickening, 359), and those with less significant non-malignant II conditions (469)—and a settlement amount was agreed upon with respect to each plaintiff in each category. In order to receive the money, each individual plaintiff would have to establish that he/she met the criteria for payment, agree to the settlement amount, and execute a release. Because of those conditions and because of the prospect of new plaintiffs being added as the firms acquired additional clients, the aggregate amount actually to be paid was not entirely certain, but, based on counsel's representations at the time, it was estimated to be $10,089,400. The agreement called for CCR to make aggregate payments to plaintiffs' counsel, "subject to change as specified after the qualification review," in three installments: $4,500,000 on July 1, 2000; $4,000,000 on June 1, 2001; and any balance on September 1, 2002.

The procedure for payment of claims was set forth in Appendix C to the Settlement Agreement. That required, among other things, that the settling plaintiff sign a full release, in the form and subject to the conditions specified in the Appendix, of all CCR members, prior to payment.

Three provisions of the Settlement Agreement have particular relevance to this case. Paragraph 7 made clear that the liability of the CCR member companies for payment of the settlement amounts was several and not joint, and it gave Plaintiffs' Counsel certain options if one or more of the member companies failed to pay its apportioned share. In that regard, ¶ 7 provided, in relevant part:

"Payments to Plaintiff Counsel by the CCR under Paragraph 5 of this Settlement Agreement shall be funded by the CCR member companies in accordance with the terms of the Producer Agreement Concerning Center For Claims Resolution (as amended, effective February 1, 1994) *and each CCR member company shall be liable under this*

*Settlement Agreement only for its individual share of such payments as determined under that Producer Agreement."* (Emphasis added).

In the event that, because of a default by one or more CCR members, CCR failed to make a payment due under the Settlement Agreement, plaintiffs' counsel was given the option, as to any plaintiffs whose claim had not yet been paid in full, of either continuing the settlement as to the non-defaulting CCR members or, by written election made within 30 days after notice of the default, declaring the entire settlement agreement void. Upon that election, the plaintiffs would have one year to bring a tort action. If counsel elected to continue the settlement as to the non-defaulting member companies, ¶ 7 provided:

"[A]s to the defaulting CCR member only, any and all plaintiffs whose claims have not been paid in full by the CCR under this Agreement shall have the option of (a) electing to enforce the Defaulting CCR member company's obligations under this Settlement Agreement or (b) electing to pursue such plaintiffs claims for asbestos-related injury against the Defaulting CCR member company in the tort system . . . ."

The second provision of note, contained in ¶ 12, was the requirement that the parties make a good faith effort to resolve any disputes that may arise while implementing the settlement agreement and that, "[i]f the parties are unable to resolve a dispute, the issue shall be referred to a mutually agreeable arbitrator for binding resolution." Finally, ¶ 21 provided that all disputes concerning the interpretation or performance of the agreement were to be resolved in accordance with Maryland law.

It appears that CCR anticipated that each installment would pay, in full, the aggregate claims of about one-third of the plaintiffs—the plaintiffs chosen by counsel whose signed releases were forwarded to CCR. The first installment, under that view, was intended to discharge the claims of 208 plaintiffs represented by Ashcraft & Gerel. When the time for

that first installment arrived, one CCR member, Asbestos Claims Management Corporation (ACMC), had failed to pay its apportioned share of $679,348. Accordingly, the first installment, sent by CCR on October 5, 2000, did not include that amount. The check, in the amount of $3,822,501, was made payable to "Ashcraft & Gerel, attorneys for 208 claimants."

Ashcraft & Gerel either had or formed a different intent. Perceiving a legal or ethical problem in drawing distinctions among its clients as to when they would be paid, the firm decided that it would be necessary to pay all of its clients on a pro rata basis from the three installments and not pay any claims in full from the first one. That created a problem, as, under the settlement protocol, all plaintiffs who would be receiving *any* payment were required to sign and submit releases acknowledging payment *in full* when, in fact, they might not receive full payment of their claim until the final installment was paid two years later. After the CCR check was deposited, William Mulroney, an attorney with that firm, requested that CCR stop payment on the check and issue a new one to "Ashcraft & Gerel as attorneys for various plaintiffs." In an October 23, 2000, follow-up letter to Michael Rooney, then the Chief Claims Officer for CCR, Mr. Mulroney advised that he had identified 88 plaintiffs whose claims were unaffected by the ACMC default, and he requested a check for $581,246 as the first payment for those clients. He also asked that CCR acknowledge that (1) all Ashcraft & Gerel Maryland clients subject to the CCR settlement are beneficiaries of the first installment payment, and (2) each of those clients "retains his or her remedies under the settlement agreement until such time as the settlement is paid in full."

In an effort to resolve the problem, Mr. Rooney agreed to at least part of Mulroney's request. In a letter to the two law firms dated October 31, 2000, he advised that CCR consented to the firms' using the installments to make partial payment to all qualified plaintiffs rather than to make full payment to three separate groups of them. In order to implement that approach, CCR agreed that:

"Each settling plaintiff will execute a release to the CCR for the full amount of the settlement prior to receiving the first installment; however, it is specifically understood and agreed that these releases are not evidence of full satisfaction of the contractual obligation of the CCR to pay the qualified plaintiffs the settlement values that have been agreed upon, and should the CCR fail to timely make any or all of the payments required by the Master Settlement Agreement, then in that event each settling plaintiff who has not received full payment may pursue *a remedy in contract* against the CCR members for any deficiency. If *such action* is required, the CCR members shall be responsible to pay the deficiency with interest at 8% per annum, and the CCR members will reimburse each such settling plaintiff for reasonable attorneys' fees and expenses that may be required to collect this deficiency *be lawsuit or otherwise.*"

and

"This remedy in contract on the release will be the sole legal remedy of each plaintiff who has executed a release for the full consideration of his settlement but fails to receive timely payment in full, with the exception of those plaintiffs who elect to renunciate the settlement because of the ACMC non-payment before accepting the first settlement installment payment." [3]

(Emphasis added).

Between October 25 and November 9, 2000, CCR sent new checks in the aggregate amount of $3,822,501 to replace the check on which, at Mr. Mulroney's request, payment had been stopped. That aggregate amount, as before, represented the first installment due under the settlement agreement less the apportioned share of ACMC. We assume that those checks were deposited and the funds disbursed.

---

3. It seems that one exception was made to this arrangement in that the non-malignant II plaintiffs—those with the least serious injury—were paid in full from the first installment.

In December, 2000, another CCR member, Armstrong World Industries, Inc., went into bankruptcy and stopped paying its share of previously negotiated settlements. On June 1, 2001, when the second installment came due, CCR sent a check to Ashcraft & Gerel "As Attorneys For 250 Plaintiffs" in the amount of $879,874, claiming, in a covering letter, that the check "constitutes full and final payment of the amounts due under the settlement for each of the claims on the enclosed list by each of the CCR member companies other than ACMC." The letter noted that, under ¶ 7 of the settlement agreement, "each CCR member company will be liable under the settlement agreement only for its individual share of the payment as determined under the CCR Producer Agreement," and that, "[a]ccordingly, none of the other CCR members is liable for the share amounts that ACMC has failed to pay." Although the letter noted the bankruptcy of Armstrong six months earlier, it does not appear that Armstrong's share was deducted.

Ashcraft & Gerel returned the check, stating that it was $181,195 less than what the contract called for, even after the ACMC and Armstrong defaults. In an August 13, 2001 letter to Daniel Myer, Director of Claims for CCR, the firm, for the first time, asserted that Mr. Rooney's October 31, 2000 letter modified the Settlement Agreement by creating a joint and several obligation on the part of all CCR members to pay the settlement amounts and by giving additional remedies to the plaintiffs. The firm demanded an alleged unpaid balance of $677,498 from the first installment (together with interest at 8% per annum) and the entire $4,000,000, plus interest, due in the second installment.

When payment was not forthcoming, the plaintiffs filed this action in the Circuit Court for Baltimore City against CCR and its 12 then-remaining members, seeking a declaratory judgment that CCR members were jointly and severally liable for all payments due under the settlement agreement and a money judgment based on that principle in the amount of $6,023,336 plus interest, costs, and attorney fees.[4] The claim

---

4. It appears that, by the time the suit was filed, two other CCR members had been terminated or had withdrawn, leaving 12 current members.

of joint and several liability was based not only on Mr. Rooney's October 31, 2000 letter but also on the final provision in Attachment A to the Producer's Agreement, stating that, if a participating member withdraws from membership or has its membership terminated, "the corresponding shares of the other Participating Producers shall be increased appropriately to pick up the shares of the withdrawing or terminating Participating Producer."

The defendants responded to the complaint with a motion to compel arbitration under ¶ 12 of the Settlement Agreement and, because the dispute was arbitrable, to dismiss the complaint. The plaintiffs contended, in opposition to the motion, that the October 31, 2000, letter from Mr. Rooney expressly gave the plaintiffs a judicial remedy for breach of contract against CCR members "for any deficiency." That, they averred, superseded the arbitration provision in the original settlement agreement. They pointed out that this very issue of arbitrability, hinged on a similar letter from Mr. Rooney, arose in Virginia with respect to CCR and a number of Virginia plaintiffs and that the Virginia Supreme Court held that the dispute was not subject to arbitration. *See Amchem Products, Inc. v. Newport News Circuit Court Asbestos Cases,* 264 Va. 89, 563 S.E.2d 739 (2002). The plaintiffs argued that the Circuit Court should apply the doctrine of collateral estoppel and not permit the defendants to relitigate an issue that they tried and lost in Virginia. After a hearing, the court granted the motion to compel arbitration but entered no order on the motion to dismiss CCR.

Aggrieved, the plaintiffs appealed, arguing in the Court of Special Appeals that the Circuit Court erred (1) in failing to find that the initial Settlement Agreement had been modified by Mr. Rooney's October 31, 2000, letter and that the modification provided a judicial remedy for any deficiency in payment, and (2) by not giving collateral estoppel effect to the Virginia decision. The branch or form of collateral estoppel posited by the plaintiffs was offensive non-mutual collateral estoppel. Traditional collateral estoppel, or issue preclusion,

requires mutuality of parties, *i.e.,* "in a second suit *between the same parties,* even if the cause of action is different, any determination of fact that was actually litigated and was essential to a valid and final judgment is conclusive." (Emphasis added). *Welsh v. Gerber Products,* 315 Md. 510, 516, 555 A.2d 486, 489 (1989) and cases cited there; also *Colandrea v. Wilde Lake,* 361 Md. 371, 387, 761 A.2d 899, 908 (2000); *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469, 475 (1970). Obviously, there was no mutuality of parties in the Maryland and Virginia litigation; none of the plaintiffs in the Maryland litigation were parties in the Virginia case, and, although CCR was a party in both actions, only three of the CCR members named as defendants in the Maryland case were parties in the Virginia action.[5]

■ Some courts have modified the mutuality requirement by precluding, in an action between A and B, relitigation of an issue decided in an earlier case to which either A or B, but not both, was a party. If the plaintiff in the second case seeks to foreclose the defendant from relitigating an issue that the defendant previously litigated unsuccessfully against other plaintiffs, the doctrine invoked is *offensive* non-mutual collateral estoppel; if the defendant seeks to preclude the plaintiff from relitigating an issue that the plaintiff previously litigated unsuccessfully against other defendants, the doctrine is referred to as *defensive* non-mutual collateral estoppel. *See Welsh, supra,* 315 Md. at 517–18, n. 6, 555 A.2d at 489, n. 6. In this case, the plaintiffs invoked *offensive* non-mutual collateral estoppel, as they sought to preclude the defendants from relitigating the issue of arbitrability that some of them raised and lost in the Virginia case.

---

**5.** Under no branch of collateral estoppel would an existing judgment have preclusive effect against a person who was not a party, or in privity with a party, in the action leading to the judgment. We presume that the plaintiffs are seeking preclusive effect against the defendants which were not parties in the Virginia case on the ground that they were in privity with persons who *were* parties in that case. The validity of any such assertion is not questioned in this appeal, and we shall not address it.

The Court of Special Appeals rejected that effort, largely on the basis of common law conflict of laws principles, although it injected into its discussion, albeit briefly, references to the Constitutional full faith and credit requirement, which none of the parties had raised in either the Circuit Court or the Court of Special Appeals.[6] Citing *Jessica G. v. Hector M.*, 337 Md. 388, 404, 653 A.2d 922, 930 (1995), the court noted that, under the Maryland law of conflict of laws, the *res judicata* effect to be given to the judgment of another State is that which the judgment would have in the State where it was rendered. Referencing *Norfolk & W. Ry. Co. v. Bailey Lumber Co.*, 221 Va. 638, 272 S.E.2d 217 (1980), the court further observed that Virginia did not recognize offensive non-mutual collateral estoppel but continued to require mutuality of parties as part of its collateral estoppel law. Thus, it held, as Virginia would not give preclusive effect to its *Amchem* decision and prevent the defendants here from litigating arbitrability in a Virginia court, preclusive effect should not be given to the judgment in a Maryland court.

On the substantive issue of arbitrability, the appellate court agreed with the Circuit Court that the Rooney letter did not suffice to modify the arbitration provision in the initial Settlement Agreement. The plaintiffs relied on two provisions in that letter, one stating that a settling plaintiff who did not receive full payment could "pursue a remedy in contract against the CCR members for any deficiency" and the other permitting the recovery of interest and costs if the plaintiffs

---

6. We are informed by plaintiffs in their petition for *certiorari* that, during oral argument, the Court of Special Appeals directed the parties to file supplemental briefs on the issue of whether, where the plaintiffs have invoked the doctrine of offensive non-mutual collateral estoppel to preclude relitigation of issues of arbitrability and joint and several liability, the trial court was obligated to give effect to the Virginia judgment or had discretion to refuse recognition without having made a determination that the defendants did not have a full and fair opportunity to litigate those issues. In their supplemental brief, the plaintiffs addressed that issue principally in terms of the Full Faith and Credit Clause, rather than in the context of common law collateral estoppel principles. Whether they did so in response to comments made by the panel at oral argument is not clear to us.

are required to collect a deficiency "by lawsuit or otherwise." The court did not view either provision as negating the arbitration clause and, to that extent, disagreed substantively with the conclusion of the Virginia court.

The plaintiffs have presented four questions for our review: (1) whether, in light of the agreement to apply Maryland law to any dispute arising from the Settlement Agreement, the Court of Special Appeals erred in applying Virginia collateral estoppel law as a basis for refusing to give the Virginia judgment preclusive effect; (2) whether the Full Faith and Credit clause and the implementing Federal statute, 28 U.S.C. § 1738, prohibits Maryland from giving greater effect to the Virginia judgment than Virginia would give to it; (3) whether Maryland recognizes offensive non-mutual collateral estoppel and, if so, whether the lower courts erred in failing to make a "fairness" determination in accordance with *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); and (4) whether the Court of Special Appeals violated the full faith and credit clause by questioning the legal basis of the Virginia judgment. Because some of these questions overlap and are, in part, not really presented, we shall address the issues in a somewhat different manner.

## DISCUSSION

### Full Faith and Credit/Collateral Estoppel

As noted, although the Constitutional full faith and credit requirement was not raised in or ruled upon by the Circuit Court, it was addressed by the Court of Special Appeals, albeit briefly. We agree with the intermediate appellate court, that, under both a full faith and credit and a common law collateral estoppel analysis, Maryland is not required to give, and, indeed, may not ordinarily give, any greater preclusive effect to the Virginia judgment than Virginia would give to it, and that, in resolving that issue, we must apply Virginia, not Maryland, collateral estoppel law.

Article IV, § 1 of the U.S. Constitution provides that full faith and credit shall be given in each State to the public acts,

records, and judicial proceedings in every other State, and that Congress may, by general laws, "prescribe the Manner in which such Acts, Records and Proceedings shall be proved, *and the Effect thereof.*" (Emphasis added). Congress enacted such a law in its very first session, in 1790, and, in fact, through that law, has expanded the Clause by requiring the Federal courts to give full faith and credit to State court judgments. Title 28 U.S.C. § 1738 prescribes the method by which legislative acts, records, and judicial proceedings are to be authenticated and proved. With respect to "effect," the statute provides that such acts, records, and judicial proceedings, so authenticated, "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." The statute is clear and has been interpreted as meaning precisely what it says: with certain very limited exceptions, such as a showing that the rendering court had subject matter and personal jurisdiction, a Federal court or the court of another State must give the same preclusive effect to the judgment of a State court as would the courts of the State that rendered the judgment, no more and no less.

 In contrast to the view of the plaintiffs, the United States Supreme Court has made clear that, in determining the preclusive effect to be given to the judgment of a State court, the claim and issue preclusion rules of the State that rendered the judgment must govern. The point was first made in *Board of Public Works v. Columbia College,* 17 Wall. 521, 84 U.S. 521, 21 L.Ed. 687 (1873).

The *Columbia College* case was a bit complex, but essentially it involved an effort in a District of Columbia court to reach property in the estate of a deceased partner of an insolvent firm. In order to recover, the plaintiff had to show that the partner's obligation was for a sum certain, and, to make that showing, the plaintiff relied on a judgment of a New York court that, in turn, had relied on a decree of a Virginia trial court. The problem was that a Virginia appellate court had

held the trial court decree to be interlocutory and therefore non-final. Because the Virginia decree would not be given preclusive effect in Virginia, the Supreme Court held that it could not be given preclusive effect in New York or the District of Columbia. Citing an earlier New York case, *Suydam v. Barber*, 18 N.Y. 468, 75 Am.Dec. 254 (1858), the Court held that "[n]o greater effect can be given to any judgment of a court of one State in another State than is given to it in the State where rendered," as "[a]ny other rule would contravene the policy of the provisions of the Constitution and laws of the United States on that subject." *Columbia College*, 84 U.S. at 529, 21 L.Ed. at 691.[7]

The subsequent cases in the Supreme Court on this issue have mostly involved the extent to which Federal courts must give preclusive effect to State court judgments, and that has hinged on the statute (§ 1738) rather than the Constitutional provision, but the analysis, to the extent the statute applies, is the same. In *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 481–82, 102 S.Ct. 1883, 1897, 72 L.Ed.2d 262, 280 (1982), the Court, in holding that a New York judgment affirming, on judicial review, an administrative determination that an employment discrimination claim had no merit was entitled to preclusive effect in a subsequent Federal court action under Title VII of the Civil Rights Act of 1964, noted that "[i]t has long been established that § 1738 does not allow federal courts to employ their own rules of res judicata in

---

**7.** In *Suydam v. Barber,* the plaintiff sued three partners in New York on a bill of exchange. One of the partners defended on the ground that the plaintiff had sued another of the partners in Missouri and recovered a judgment, and that, under New York law, recovery of a judgment against one partner extinguished the debt against the others. Missouri law was to the contrary, however, and the New York court applied the Missouri law in determining that the Missouri judgment did not have preclusive effect. The court observed: "[N]o case can be found where a greater effect is given to the judgment of any State in the courts of another than belongs to it in the State where it was rendered. Indeed, such a rule would be against all reason, and not only out of the policy of the provisions of the constitution and laws of the United States on that subject, but against and irreconcilable with all policy and with the plainest and fundamental principles of justice." 18 N.Y. at 472.

determining the effect of state judgments. Rather, it goes beyond the common law and commands a federal court to accept the rules chosen by the State from which the judgment is taken." That view has been confirmed on a number of occasions. *See Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Haring v. Prosise,* 462 U.S. 306, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983); *Migra v. Warren City School Dist. Bd. of Ed.,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) (the concerns of comity reflected in § 1738 generally allow States to determine the preclusive scope of their own courts' judgments.); *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 1332, 84 L.Ed.2d 274, 281 (1984).

In *Migra,* a discharged teacher recovered judgment in an Ohio State court against the school board for breach of contract. Although she sued the individual board members for conspiracy and interference with her contract, she did not bring a § 1983 action against them, as she could have done. The State court awarded her a judgment for breach of contract but dismissed the claims against the individual board members. Migra then filed a § 1983 action in Federal court against the board members, and the question arose whether, having failed to make that claim in the Ohio litigation, she was barred by claim preclusion from bringing the action in Federal court. The Federal court dismissed the action on *res judicata* grounds. The Supreme Court made clear that the plaintiff's "state-court judgment in this litigation has the same claim preclusive effect in federal court that the judgment would have in the Ohio state courts." *Id.* at 85, 104 S.Ct. at 898, 79 L.Ed.2d at 64. Uncertain whether the District Court had applied the Ohio law of preclusion or its own, the Supreme Court remanded the case for the trial court to apply the Ohio law. In *Marrese,* the Court, in discussing *Migra,* observed that "[s]uch a remand obviously would have been unnecessary were a federal court free to give greater preclusive effect to a state court judgment than would the judgment-rendering State." *Marrese, supra,* 470 U.S. at 384, 105 S.Ct. at 1334, 84 L.Ed.2d at 284. The *Marrese* Court added that § 1738 "em-

bodies concerns of comity and federalism that allow the States to determine, subject to the requirements of the statute and the Due Process Clause, the preclusive effect of judgments in their own courts." *Id.* at 380, 105 S.Ct. at 1332, 84 L.Ed.2d at 281.

The expressions and holdings in these § 1738 cases are entirely consistent with the pronouncements of the Supreme Court in Constitutional full faith and credit cases. *See,* for example, *Ford v. Ford,* 371 U.S. 187, 192, 83 S.Ct. 273, 276, 9 L.Ed.2d 240, 244 (1962) ("The Full Faith and Credit Clause, if applicable to a custody decree, would require South Carolina to recognize the Virginia order as binding only if a Virginia court would be bound by it."); *Riley v. New York Trust Co.,* 315 U.S. 343, 349, 62 S.Ct. 608, 612, 86 L.Ed. 885, 891 (1942) ("That clause compels that controversies be stilled so that where a state court has jurisdiction of the parties and subject matter, its judgment controls in other states to the same extent as it does in the state where rendered."); *Morris v. Jones,* 329 U.S., 545, 551, 67 S.Ct. 451, 456, 91 L.Ed. 488, 496 (1947) ("The full faith and credit to which a judgment is entitled is the credit which it has in the State from which it is taken, not the credit that under other circumstances and conditions it might have had."). Those expressions and holdings have been echoed by lower Federal courts and by various State courts [8], and are consistent with language from our cases.[9] Where the full faith and credit issue involves full claim

---

8. *See Clyde v. Hodge,* 413 F.2d 48 (3rd Cir.1969); *United States v. Dominguez,* 359 F.3d 839 (6th Cir.2004); *Far Out Productions, Inc. v. Oskar,* 247 F.3d 986 (9th Cir.2001); *Federal Ins. Co. v. Gates Learjet Corp.,* 823 F.2d 383 (10th Cir.1987); *Farred v. Hicks,* 915 F.2d 1530 (11th Cir.1990); *Prudential Securities Inc. v. Arain,* 930 F.Supp. 151 (S.D.N.Y.1996); *Centre Equities, Inc. v. Tingley,* 106 S.W.3d 143 (Tex. App.2003); *Columbia Cas. Co. v. Playtex FP, Inc.,* 584 A.2d 1214 (Del.1991).

9. *See Weinberg v. Johns–Manville Sales Corp.,* 299 Md. 225, 234, 473 A.2d 22, 27 (1984) and cases cited there ("Under the principles of full faith and credit, a state court is generally required to give judgments rendered in other states the same effect that they have in the rendering state."); *Jessica G. v. Hector M.,* 337 Md. 388, 405, 653 A.2d 922, 931

preclusion (traditional *res judicata*), there seems to be little or no disagreement with the proposition that the rendering State's preclusion rules will apply, and that seems to be the majority rule as well when only issue preclusion (collateral estoppel) is at stake. *See* Gregory S. Getschow, *If At First You Do Not Succeed: Recognition of State Preclusive Laws In Subsequent Multistate Actions*, 35 Vill. L. Rev. 253 (1990). Some courts, however, have applied their own preclusion rules in the latter context. *Id.* Getschow views the first approach as effectively merging the preclusion rules into the judgment; the rendering State's preclusion law is applied because it has become part of the judgment. The second approach, he says, views preclusion as independent of full faith and credit, allowing the second State to apply its own rule.

Whether one uses that analysis or some other, we believe that the view enunciated by the Supreme Court is the better rule, even if it is not a Constitutionally required one. The full faith and credit clause was taken from a similar clause in Article 4 of the Articles of Confederation. *See Brengle v. McClellan*, 7 G. & J. 434, 439 (Md.1836). Although, as noted in *Johnson v. Muelberger*, 340 U.S. 581, 584, 71 S.Ct. 474, 476, 95 L.Ed. 552, 556 (1951), there is little or no legislative history to explain the purpose and meaning of either the Constitutional provision or the statute, from judicial experience "there has emerged the succinct conclusion that the Framers intended it to help weld the independent states into a nation by giving judgments within the jurisdiction of the rendering state the same faith and credit in sister states as they have in the state of the original forum." *See also Magnolia Petroleum Co. v. Hunt*, 320 U.S. 430, 439, 64 S.Ct. 208, 214, 88 L.Ed. 149, 155–56 (1944) ("It altered the status of the several states as independent foreign sovereignties, each free to ignore rights

(1995) ("By giving to the New York judgment the same effect which the courts of New York would give to that judgment, we thereby also honor the Full Faith and Credit Clause."); *also Wernwag v. Pawling*, 5 G. & J. 500, 507 (Md.1833); *Brengle v. McClellan*, 7 G. & J. 434, 440–41 (Md.1836); *Madden v. Cosden*, 271 Md. 118, 125, 314 A.2d 128, 132 (1974).

and obligations created under the laws or established by the judicial proceedings of the others, by making each an integral part of a single nation, in which rights judicially established in any part are given nation-wide application.").[10]

Neither that unifying role of the clause nor its complementary function of preserving to the States the power to determine the effect to be given to their own judgments is well served when, absent some truly compelling and Constitutionally permissible circumstance, States treat the judgment of a sister State differently than it would be treated in the State of rendition. That is especially the case with respect to failing to respect the rendering State's issue preclusion law. Whether and how far to depart from the traditional requirement of collateral estoppel that there be mutuality of parties has been, and ought to remain, a policy decision for each State to make. This Court has gone so far as to recognize *defensive* nonmutual collateral estoppel, at least where the party sought to be bound by the existing judgment had a full and fair opportunity to litigate the issues in question. *See Pat Perusse Realty v. Lingo,* 249 Md. 33, 238 A.2d 100 (1968). We have acknowledged, however, that "there are many situations where application of the doctrine of nonmutual collateral estoppel would be manifestly unfair," *Welsh, supra,* 315 Md. at 517, 555 A.2d at 489, and we have yet to formally embrace *offensive* nonmutual collateral estoppel.

The Supreme Court, as an aspect of Federal law, has departed from the mutuality requirement, although in *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552, it expressed some concerns about, and refrained from blessing the broad application of, offensive non-mutuality. The Court articulated two reasons posited for why offensive and defensive non-mutuality should not be treated the

---

**10.** The actual holding in *Magnolia, supra,* that a person having received workers compensation benefits in one state could not then receive them in another State for the same injury, was significantly limited in *Industrial Comm'n of Wisconsin v. McCartin,* 330 U.S. 622, 67 S.Ct. 886, 91 L.Ed. 1140 (1947), and later overruled in *Thomas v. Washington Gas Light Co.,* 448 U.S. 261, 100 S.Ct. 2647, 65 L.Ed.2d 757 (1980).

same. First, "offensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does." *Id.* at 329, 99 S.Ct. at 650, 58 L.Ed.2d at 561. The Court explained that, whereas defensive collateral estoppel gives a plaintiff a strong incentive to join all potential defendants in the first action, if possible, offensive collateral estoppel creates a contrary incentive: "[s]ince a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment." *Id,* at 330, 99 S.Ct. at 651, 58 L.Ed.2d at 561.

A second argument against offensive non-mutual collateral estoppel is that it may be unfair to the defendant, for several reasons. The Court noted (1) that "[i]f a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable," (2) offensive use may be unfair as well "if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant," and (3) such use may be unfair "where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Id.* at 330–31, 99 S.Ct. at 651, 58 L.Ed.2d at 562.

Each State supreme court should resolve these policy questions for itself and not have other courts determine the effect of the judgments rendered by the courts of that State. Professor Charles Alan Wright makes the appropriate point that "[t]he first court should have the power to limit the effect of its own proceedings," and that that power "would be destroyed if the parties could not rely on the mutuality rule adopted by the first court." 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4467, at 50 (2d ed. 2002). Wright observes elsewhere:

"If the court that rendered judgment would deny nonmutual preclusion, later courts should honor that policy. Assertion of nonmutual preclusion in such circumstances would make it impossible for the first court to give effect to policies that may include broad freedom in selecting parties, freedom to litigate a particular case according to its own needs without concern about the impact on other cases, and acceptance of results that seem just between particular parties even though a new trial or directed verdict—or at least an appeal—would be required if the stakes were greater."

18A CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 4465.5 at 806 (2d ed. 2002).

Virginia has made its choice. In *Norfolk and W. Ry. Co. v. Bailey Lumber Co.*, 221 Va. 638, 272 S.E.2d 217, 218 (1980), the Virginia Supreme Court explored the reasons favoring and disfavoring the adoption of offensive non-mutual collateral estoppel and decided to retain the traditional requirement of mutuality. In that case, the court "reaffirmed Virginia's adherence to the principle of mutuality which holds that 'a litigant is generally prevented from invoking the preclusive force of a judgment unless he would have been bound had the prior litigation of the issue reached the opposite result.'" *Rawlings v. Lopez*, 267 Va. 4, 591 S.E.2d 691, 692 (2004), quoting in part from *Bates v. Devers*, 214 Va. 667, 202 S.E.2d 917, 921 (1974). In *Rawlings*, the Virginia court maintained its adherence to that principle. *See also TransDulles Center, Inc. v. Sharma*, 252 Va. 20, 472 S.E.2d 274 (1996).

For all of these reasons, we hold that, in applying full faith and credit to the Virginia judgment, a Maryland court must treat the judgment precisely the same as it would be treated in a Virginia court, and that requires that we apply the preclusion rules that would be applied in Virginia.[11] That is

---

11. The plaintiffs rely on *Hart v. American Airlines, Inc.*, 61 Misc.2d 41, 304 N.Y.S.2d 810 (Sup.Ct.N.Y.Co.1969) and *Finley v. Kesling*, 105 Ill.App.3d 1, 60 Ill.Dec. 874, 433 N.E.2d 1112 (1982) in support of their argument that we should apply Maryland preclusion law. *Hart*, a trial court decision, did not rest on a full faith and credit analysis, as the

also the approach this Court has taken in applying principles of common law collateral estoppel. *See Jessica G. v. Hector M., supra,* 337 Md. 388, 404, 653 A.2d 922, 930, where, citing two earlier cases, we confirmed that "[u]nder the Maryland law of conflict of laws, the *res judicata* effect to be given to the judgment of a court of a foreign state is the *res judicata* effect that that judgment has in the state where the judgment was rendered." As the parties agree that Virginia continues to require mutuality as part of its collateral estoppel law and would therefore not give preclusive effect to its *Amchem* judgment in a second action by different plaintiffs, and clearly would not, and could not, give preclusive effect to it against defendants who were not parties, or in privity with parties, in the Virginia action, the Circuit Court and the Court of Special Appeals were correct in not giving preclusive effect to it in this action.

### *Whether the Plaintiffs' Claims Are Arbitrable*

█ Because the Circuit Court was not bound in any way by the Virginia judgment, it had to decide for itself whether the claims asserted by the plaintiffs were subject to arbitration under either (or both) the Federal Arbitration Act (Title

---

earlier judgment was rendered by a Federal court, not the court of another State, and, in any event seems inconsistent with the holding of the New York Court of Appeals in *Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985). *Finley* supports the plaintiffs' position, but is simply not persuasive in light of the overwhelming contrary authority.

Plaintiffs also assert that, because of ¶ 21 of the Settlement Agreement, which requires that any dispute concerning the interpretation or performance of the agreement be resolved in accordance with Maryland law, we should give the Virginia judgment the same effect as we would give a Maryland judgment, *i.e.,* we should not apply Virginia's requirement of mutuality. We are not persuaded. For one thing, for plaintiffs to prevail, we would have to apply, as Maryland law, offensive non-mutual collateral estoppel, and, as noted, we have not yet embraced that aspect of non-mutuality and decline to do so in this case. We shall honor ¶ 21 by applying Maryland law to the issue at hand, *i.e.,* determining whether the dispute is subject to arbitration. One aspect of that issue is the effect to be given to the Virginia judgment. The Maryland law regarding that aspect is that we give the judgment the same effect as Virginia would give it.

9, U.S.C.) or the Maryland Uniform Arbitration Act (Maryland Code, title 3, subtitle 2 of the Cts. & Jud. Proc. Article). Both statutes make a provision in a written agreement to submit to arbitration any controversy arising between the parties in the future valid and enforceable and, upon petition by a party seeking to compel arbitration, require a court, upon finding that an agreement to arbitrate the dispute exists, to order arbitration. *See* title 9, U.S.C. §§ 2 and 4, and Maryland Code, §§ 3–206(a) and 3–207 of the Cts. & Jud. Proc. Article. The only issue for the court in such a proceeding is whether an enforceable agreement exists to arbitrate the underlying dispute; the court is not concerned with the merits of that dispute. *Allstate Ins. Co. v. Stinebaugh*, 374 Md. 631, 642, 824 A.2d 87, 94 (2003) and cases cited there.

There can be no doubt that the arbitration provision set forth in ¶ 12 of the Settlement Agreement is an all-inclusive one, requiring that "any disputes that may arise while carrying out the terms and conditions of this Agreement" not resolved by the parties amicably be submitted to binding arbitration. That provision is certainly broad enough to include a dispute over whether non-defaulting members of CCR are liable for the unpaid shares of defaulting members. The issue is whether that provision has been abrogated or mitigated by Mr. Rooney's letter of October 31, 2000.

We dealt with a similar issue in *Allstate*. Two issues were framed in that case: (1) whether it is for the court or the arbitrator to determine arbitrability when the parties entered into a general arbitration agreement but subsequently bound themselves to a consent order that contemplated a judicial remedy; and (2) the effect of an agreement that contemplates a judicial remedy for the particular dispute upon a prior general arbitration agreement that would have required arbitration of the dispute. We concluded, as to the first issue, that "courts, not arbitrators, should decide whether a prior agreement to arbitrate disputes applies when a subsequent agreement calls for a judicial resolution of the particular controversy." *Allstate, supra*, 374 Md. at 635, 824 A.2d at 89.

As to the second issue, we held that the subsequent consent order did, indeed, provide a judicial remedy for the dispute at hand and therefore superseded the earlier general arbitration provision.

The first issue in *Allstate* is presented here as well. Although it rests on a matter of contract construction—the effect of the Rooney letter—the issue relates directly to and indeed determines whether there is a currently viable agreement to arbitrate, which is an issue that the court must decide.[12]

In construing contracts, Maryland follows the objective interpretation principle. If the language of the contract is unambiguous, we give effect to its plain meaning and do not delve into what the parties may have subjectively intended. *Wells v. Chevy Chase Bank, F.S.B.,* 363 Md. 232, 250–51, 768 A.2d 620, 630 (2001). Where the contract comprises two or more documents, the documents are to be construed together, harmoniously, so that, to the extent possible, all of the provisions can be given effect. *See Rocks v. Brosius,* 241 Md. 612, 637, 217 A.2d 531, 545 (1966); *Rothman v. Silver,* 245 Md. 292, 296, 226 A.2d 308, 310 (1967); *Bachmann v. Glazer & Glazer, Inc.,* 316 Md. 405, 415, 559 A.2d 365, 369 (1989). In terms of the issue before us, that requires looking at the Rooney letter to see what, if anything, in it precludes giving effect to ¶ 12 of the Settlement Agreement.

The Rooney letter, as noted, was intended to resolve the problem of requiring all settling plaintiffs to execute a release for the full amount of their respective settlements in advance

---

**12.** It is important to keep clear that the issue here is not the *scope* of an arbitration clause—whether it applies to the particular dispute. Where scope is the issue and there is any ambiguity as to whether the agreement covers the particular dispute, we have held that the issue of arbitrability is, at least initially, for the arbitrator to determine. *Gold Coast Mall v. Larmar Corp.,* 298 Md. 96, 107, 468 A.2d 91, 97 (1983). The issue here is whether, by virtue of the Rooney letter, the arbitration agreement that clearly covered this dispute continues to apply. That goes to the continued existence, rather than the scope, of an arbitration agreement.

of receiving only a partial payment of the settlement. Some provision needed to be made for reserving their rights if they did not ultimately receive all that they were entitled to receive under the settlement agreement. To that end, the letter stated:

"[S]hould the CCR fail to timely make any or all of the payments required by the Master Settlement Agreement, then in that event each settling plaintiff who has not received full payment may pursue *a remedy in contract* against the CCR members for any deficiency. If *such action* is required, the CCR members shall be responsible to pay the deficiency with interest at 8% per annum, and the CCR members will reimburse each such settling plaintiff for reasonable attorneys' fees and expenses that may be required to collect this deficiency *by lawsuit or otherwise.*"

(Emphasis added).

The plaintiffs view the italicized language—"a remedy in contract," "such action," and "by lawsuit or otherwise" as providing a judicial remedy in the event of any shortfall in full payment. We do not agree. Permitting "a remedy in contract" does not foreclose arbitration as the remedy. To state that if "such action" is required to collect the deficiency the plaintiffs will be entitled to interest, attorneys' fees, and expenses does not indicate that the collection action is to be other than a claim submitted to arbitration. Indeed, if the two sentences are to be read together harmoniously, "such action" would necessarily refer to the "remedy in contract." In the absence of a general arbitration clause in the contract, those provisions certainly would permit a judicial action to collect the deficiency and ancillary expenses, but they are in no way inconsistent with the arbitration provision and can be given full meaning in harmony with that provision.

The language that gave the Circuit Court some pause was the last provision, requiring the CCR members to pay the ancillary fees and expenses that may be required to collect the deficiency "by lawsuit or otherwise." That language—the reference to "lawsuit"—is not necessarily inconsistent with the

arbitration provision, however, and can be read in full harmony with it. Under the Settlement Agreement, plaintiffs' counsel is given certain options in the event an installment is short because one or more CCR members failed to contribute their share of the installment. Counsel could declare the entire settlement agreement void, in which event the plaintiffs could sue the defendants in tort.

If counsel elected to "continue" the settlement agreement as to the non-defaulting CCR members, the plaintiffs had the option, as to the defaulting members, of "(a) electing to enforce the Defaulting CCR member company's obligations under this Settlement Agreement or (b) electing to pursue such plaintiffs claims for asbestos-related injury against the Defaulting CCR member company in the tort system." Implicit in that construct is that, if counsel elected to "continue" the settlement with the non-defaulting CCR members, the agreement, and, with it, the arbitration requirement, would be terminated as to the defaulting members. That would allow, as an alternative to a tort action, a lawsuit for breach of contract against the defaulting members to collect the deficiency and, under the Rooney letter, interest, expenses, and attorneys' fees as well. Read in that manner, the language is entirely consistent with maintaining the arbitration requirement as to any dispute with the non-defaulting CCR members, which is precisely what this case involves.

That construction of the Rooney letter is favored not only by the requirement that all provisions of a contract be read together harmoniously, so that each can be given effect, but also by the ordinary mandate that, where an arbitration agreement exists, ambiguities as to arbitrability be resolved in favor of arbitration. Notwithstanding the contrary conclusion of the Virginia courts in their *Amchem* decisions, we find no basis in the record before us for refusing to enforce ¶ 12 of the Settlement Agreement.

BELL, C.J., and CATHELL, J., Dissent.

BELL, Chief Judge, dissenting in which CATHELL, J., joins.

This case involves the collateral estoppel effect of a prior judgment, entered in a case in which the defendants in this case participated,[1] and interpreting a settlement agreement, which, except that it was with different plaintiffs, was virtually identical to the one at issue in this case. The issue would be a straight-forward, even simple, issue of a State applying its rules of issue preclusion, but for a complicating and seemingly perpetually confusing factor, the prior judgment was entered by a neighboring State court. While I do not believe that that factor does, or should, change the analysis, the majority does. Thus, it affirms, and on the same rationale, the judgment of the Court of Special Appeals, which, affirming the judgment of the Circuit Court for Baltimore City, but unlike that court, invoked the full faith and credit clause of the United States Constitution. *Rourke v. Amchem,* 153 Md.App. 91, 116–18, 835 A.2d 193, 207–208 (2003). *Rourke v. Amchem,* 384 Md. 329, 332, 343–52, 863 A.2d 926, 928, 934–40. For the reasons that follows, I dissent.

Collateral estoppel is an "aspect of the finality of judgments between the parties" to litigation. *Welsh v. Gerber Prods., Inc.,* 315 Md. 510, 517, 555 A.2d 486, 489 (1989). Often characterized as issue preclusion, *id.*; *Kent County Bd. of Educ. v. Bilbrough,* 309 Md. 487, 490, 525 A.2d 232, 233 (1987). While "[c]laim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit," *Bilbrough,* 309 Md. at 490, 525 A.2d at 233, it is "concerned with the issue implications of the earlier litigation of a different case." *Colandrea v. Wilde Lake Community Ass'n, Inc.,* 361 Md. 371, 390, 761 A.2d 899, 909 (2000). We have explained the principle as being "that in a

---

1. The majority points out that not all of the appellees in this case were actual parties in the Virginia case. *Rourke v. Amchem. Products, Inc.,* 384 Md. 329, 340–41, 863 A.2d 926, 932–33. It also points out, and this is more to the point, that no issue has been presented with respect to the privity of these appellees to the parties in the Virginia case.

second suit between the same parties, even if the cause of action is different, any determination of fact that was actually litigated and was essential to a valid and final judgment is conclusive." *Welsh,* 315 Md. at 516, 555 A.2d at 489. *See Murray International v. Graham,* 315 Md. 543, 547, 555 A.2d 502, 504 (1989), quoting Restatement (Second) of Judgments, § 27 (1982) ("[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."). *See* also *Janes v. State,* 350 Md. 284, 295, 711 A.2d 1319, 1324 (1998); *MPC, Inc. v. Kenny,* 279 Md. 29, 32, 367 A.2d 486, 489 (1977); *Frontier Van Lines v. Md. B. & Tr. Co.,* 274 Md. 621, 624, 336 A.2d 778, 780 (1975); *Travelers Insur. Co. v. Godsey,* 260 Md. 669, 676, 273 A.2d 431 (1971); *Sterling v. Local 438, etc.,* 207 Md. 132, 143, 113 A.2d 389, *cert. denied,* 350 U.S. 875, 76 S.Ct. 119, 100 L.Ed. 773 (1955).

This is consistent with the formulation of the test by the United States Supreme Court. In *Ashe v. Swenson,* that Court stated the principle as follows:

> " 'Collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."

397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469, 475 (1970). It stated the principle a little differently in *Montana v. U.S.,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210, 217 (1979), quoting *Southern Pacific R. Co. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355, 376–377(1897):

> "A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a 'right, question or fact distinctly put in issue and directly determined by a court of competent

jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies....' "

*See Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552, 559 n. 5 (1979) ("Under the doctrine of collateral estoppel ... a second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.").

Underlying the doctrine of collateral estoppel, as well as its cousin, res judicata, are policy, practical necessity and justice considerations. *Pat Perusse Realty v. Lingo,* 249 Md. 33, 42, 238 A.2d 100, 106 (1968), quoting *Williams v. Messick,* 177 Md. 605, 615, 11 A.2d 472, 476 (1940). Thus, we have stated:

"The functions of this doctrine, and the allied doctrine of *res judicata,* are to avoid the expense and vexation of multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibilities of inconsistent decisions."

*Graham, supra,* 315 Md. at 547, 555 A.2d at 504, citing *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210, 217 (1979). *See MPC, Inc. v. Kenny,* 279 Md. at 34–35, 367 A.2d at 490 (public policy against interminable litigation); *Pat Perusse,* 249 Md. at 45, 238 A.2d at 107–108 (public policy against repetitive identical litigation, which underlies the rule of res judicata, applies here with logic and force to provide that Perusse's rights were satisfied by having had its day in court on an issue, and that it is not entitled to another day in court against a particular defendant on that issue"); *Prescott v. Coppage,* 266 Md. 562, 570–73, 296 A.2d 150, 154–155 (1972). *See* also *Powers v. State,* 285 Md. 269, 283–284, 401 A.2d 1031, 1039 (1979) ("Thus, the primary purpose of the doctrine of collateral estoppel is to protect an accused from the unfairness of being required to relitigate an issue which has once been determined in his favor by a verdict of acquittal."). Stated differently, collateral estoppel is "based on the judicial policy that the losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceed-

ings, on issues raised" and decided. *Colandrea v. Wilde Lake Community Ass'n, Inc.,* 361 Md. at 391, 761 A.2d at 909, citing *Department of Human Resources v. Thompson,* 103 Md.App. 175, 194, 652 A.2d 1183, 1192 (1995).

The Supreme Court has articulated the purpose of collateral estoppel in a similar manner:

> "Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation."

*Parklane Hosiery,* 439 U.S. at 326, 99 S.Ct. at 649, 58 L.Ed.2d at 559, citing *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 328–29, 91 S.Ct. 1434, 1442–1443, 28 L.Ed.2d 788, 799 (1971). It has concluded, moreover, that "[a]pplication of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions." *Montana,* 440 U.S. 147 at 153, 99 S.Ct. at 973, 59 L.Ed.2d at 217.

"Collateral estoppel is not concerned with the legal consequences of a judgment, ... only with the findings of ultimate fact ... that necessarily lay behind that judgment." *Colandrea v. Wilde Lake Community Ass'n, Inc.,* 361 Md. at 391, 761 A.2d at 909, citing *Burkett v. State,* 98 Md.App. 459, 465, 633 A.2d 902, 905 (1993), *cert. denied* 334 Md. 210, 638 A.2d 752 (1994). It is, rather, a tool that is designed to facilitate and promote the most efficient and most productive processing of cases by a court system. When applied effectively, it results in the most effective and productive allocation of judicial resources. Thus, collateral estoppel, true also of res judicata, is a judiciary's docket and workload control device; it is not a tool designed to assess the effect or effectiveness of foreign judgments. This is evident by the test that this Court has developed to test the applicability of collateral estoppel in a given fact situation. That test is set out in *Washington*

*Suburban Sanitary Commission v. TKU Associates,* 281 Md. 1, 18–19, 376 A.2d 505, 514 (1977):

"1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?

"2. Was there a final judgment on the merits?

"3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?

"4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?"

A corollary to the rule of res judicata and collateral estoppel is, and has been, the theory of mutuality. *Pat Perusse,* 249 Md. at 35, 238 A.2d at 102. That corollary is, "estoppels must be mutual and one . . . who himself was bound by the prior judgment cannot assert res judicata against him to whom it was adverse." *Id.* Its rationale is straightforward:

"Justice requires that every cause be once fairly and impartially tried; but the public tranquility demands that having been once so tried, all litigation of that question, and between those parties, should be closed forever. It is also a most obvious principle of justice, that no man ought to be bound by proceedings to which he was a stranger."

*Cecil v. Cecil,* 19 Md. 72, 79, 1862 WL 2345, *5 (1862). Thus, in its most rigid form, "the mutuality requirement provided a party who had litigated and lost in a previous action an opportunity to relitigate identical issues with new parties." *Parklane Hosiery,* 439 U.S. at 327, 99 S.Ct. at 649, 58 L.Ed.2d at 559–560. Moreover, "[b]y failing to recognize the obvious difference between a party who has never litigated an issue and one who has fully litigated and lost, the mutuality requirement was criticized almost from its inception." *Id.*

Like the rules to which it is corollary, the theory of mutuality is also:

"based upon policy and practical necessity and justice . . . and on the same grounds of policy and justice there would be no objection to departing from it where the party affected has been given an adequate opportunity to be heard either personally or by representation."

*Pat Perusse,* 249 Md. at 42, 238 A.2d at 106. Relevant to the policy and justice grounds is the determination of "the desirability of granting or imposing the benefit or burden of issue preclusion in situations where there is not a complete identity of parties." *Welsh v. Gerber,* 315 Md. at 517, 555 A.2d at 489. In that regard, it is clear that a critical determinant is whether the party to be bound, estopped, had a full and fair opportunity to litigate the issue in question. *Id.; Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. at 329, 91 S.Ct. at 1443, 28 L.Ed.2d at 799. Another policy consideration was identified by the Supreme Court: "whether it is any longer tenable to afford a litigant more than one full and fair opportunity for judicial resolution of the same issue." *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. at 328, 91 S.Ct. at 1442, 28 L.Ed.2d at 799.[2]

---

**2.** The Supreme Court's response was emphatic, strongly suggesting that the answer to the question posited should be, "no." *Parklane Hosiery,* 439 U.S. at 328, 99 S.Ct. at 650, 58 L.Ed.2d at 560. The Court's response was:

"In any lawsuit where a defendant, because of the mutuality principle, is forced to present a complete defense on the merits to a claim which the plaintiff has fully litigated and lost in a prior action, there is an arguable misallocation of resources. To the extent the defendant in the second suit may not win by asserting, without contradiction, that the plaintiff had fully and fairly, but unsuccessfully, litigated the same claim in the prior suit, the defendant's time and money are diverted from alternative uses—productive or otherwise—to relitigation of a decided issue. And, still assuming that the issue was resolved correctly in the first suit, there is reason to be concerned about the plaintiff's allocation of resources. Permitting repeated litigation of the same issue as long as the supply of unrelated defendants holds out reflects either the aura of the gaming table or 'a lack of discipline and of disinterestedness on the part of the lower courts, hardly a worthy or wise basis for fashioning rules of procedure.' *Kerotest Mfg. Co. v. C–O–Two [Fire Equipment] Co.,* 342 U.S. 180, 185, 72 S.Ct. 219, 222, 96 L.Ed. 200, 204 (1952). Although neither judges, the parties, nor the adversary system performs perfectly in all cases, the requirement of determining whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate is a most significant safeguard."

*Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788, 799–800 (1971).

Fueled by the criticism of the mutuality principle and policy and justice concerns, the principle of non-mutual collateral estoppel [3] relatively recently has developed, as an exception to the mutuality principle. After noting the exceptions and modifications that had been made to the theory of mutuality, over time, and the reasons therefor, *Pat Perusse*, 249 Md. at 35–41, 238 A.2d at 102–105, this Court upheld the application of defensive non-mutual collateral estoppel. *Id.* at 45, 238 A.2d at 107–108. Subsequently, acknowledging the validity of the criticism of the mutuality doctrine, the Supreme Court abandoned the mutuality requirement, also in the case of defensive non-mutual collateral estoppel. *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. at 328–334, 91 S.Ct. at 1434–1445, 28 L.Ed.2d at 799–803.

To be sure, the Court, in *Parklane Hosiery*, identified the difference between the use of non-mutual collateral estoppel for defensive purposes and for offensive purposes and catalogued some of the problems that may be encountered when non-mutual collateral estoppel is used offensively. 439 U.S. at 329–331, 99 S.Ct. at 650–51, 58 L.Ed.2d at 561–562. Nevertheless, the Court did not preclude the use of offensive non-mutual collateral estoppel, rather it:

"concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied.... The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defen-

---

**3.** In *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 n. 4, 99 S.Ct. 645, 649 n. 4, 58 L.Ed.2d 552, 559 n. 4 (1979), the Court observed:

"In this context, offensive use of collateral estoppel occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party. Defensive use occurs when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant."

dant, a trial judge should not allow the use of offensive collateral estoppel."

*Id.* at 331, 99 S.Ct. at 651–52, 58 L.Ed.2d at 562.

The Court of Appeals discussed non-mutual collateral estoppel in *Welsh v. Gerber Prods., Inc.,* 315 Md. 510, 555 A.2d 486, *supra,* a case involving a certified question from the federal court which required the Court to address the attempted defensive use of non-mutual collateral estoppel. In addition to defining the two kinds of non-mutual collateral estoppel, *id.* at 517 n. 6, 555 A.2d at 490 n. 6, and noting the pertinent developments, including the Supreme Court's refusal, despite its recognition of problems in its implementation, to preclude use of non-mutual offensive collateral estoppel, *id.* at 517–18, 555 A.2d at 489–90, pertinent to this case, we said:

"Conceptually, there will be instances in which a party who has had the benefit of a full and fair adjudication of an issue should be bound by that adjudication, even in a subsequent proceeding involving a different party. The difficulty is, however, that there are many situations where application of the doctrine of nonmutual collateral estoppel would be manifestly unfair."

*Id.* at 517, 555 A.2d at 489. The Court also emphasized the necessity that "the party to be bound must have had a full and fair opportunity to litigate the issue in question," characterizing that requirement as "[t]he foundation of the rule of nonmutual collateral estoppel." *Id.* at 518, 555 A.2d at 490. Accordingly, characterizing the *Welsh v. Gerber* case, the Court of Special Appeals correctly observes, that this Court "has indicated that [non-mutual offensive collateral estoppel] may be employed under proper circumstances." *Amchem I,* 153 Md.App. at 112, 835 A.2d at 204.

While it set out the test developed by this Court to determine the applicability of collateral estoppel, addressed some of the factors, enumerated the arguments of counsel on the point and reviewed some of the pertinent facts concerning the Virginia litigation, contrasting it to that in this case, *id.* at 108–115, 835 A.2d at 202–206, rather than determining the correctness of the trial court's refusal to apply offensive non-

mutual collateral estoppel, the intermediate appellate court decided the case on the basis of a full faith and credit analysis,[4] thus adopting one of the two arguments advanced by the appellees.

The majority follows suit, "agree[ing] with the intermediate appellate court that, under both a full faith and credit and a

---

4. The majority characterizes the Court of Special Appeals' consideration of the Constitutional full faith and credit issue as brief and suggests that that court also decided this case on the basis of common law collateral estoppel. *Rourke v. Amchem Products, Inc.,* 384 Md. 329, 343, 863 A.2d 926, 934. While, when considered in the context of the entire discussion, the full faith and credit portion may have been brief, approximately 2 of the 10½ pages devoted to the subject of "Offensive Non-mutual Collateral Estoppel," *Rourke v. Amchem. Products, Inc.,* 153 Md.App. 91, 108–118, 835 A.2d 193, 202-208 (2003), the fact is, it was that discussion that was dispositive.

The record does not support the majority's suggestion that the intermediate appellate court relied on common law collateral estoppel for the decision in this case. As indicated, the discussion of offensive non-mutual collateral estoppel covered some 10½ pages. To be sure, the intermediate appellate court acknowledged the pedigree of collateral estoppel, noting its common law beginnings, *id.* at 109, 835 A.2d at 203, citing *Colandrea v. Wilde Lake Community Ass'n, Inc.,* 361 Md. 371, 387, 761 A.2d 899, 907 (2000); however, the balance of the discussion, *see* 153 Md.App. at 113, 835 A.2d at 205, involved the review of the arguments of counsel and of the doctrine of non-mutual collateral estoppel and a discussion of *Parklane Hosiery,* and *Welsh v. Gerber.* Then, after stating that it was going to "find use of the doctrine inappropriate to the circumstances of this case," 153 Md.App. at 113, 835 A.2d at 205, the Court of Special Appeals discussed the test for collateral estoppel, the Virginia Supreme Court decision and the arguments of counsel on the issue of the appropriateness of applying offensive non-mutual collateral estoppel. *Id.* at 113-115, 835 A.2d at 205–206. The last portion of the discussion was introduced, as follows: "We address the two arguments they [presumably, the appellees] present that we find pertinent to this case: the effect of conflicting opinions and the proper application of Full Faith and Credit." *Id.* at 115, 835 A.2d at 205. After rejecting the conflicting prior opinions rationale, *id.* at 115-116, 835 A.2d at 206, the court concluded:
"Although Maryland may not require mutuality of parties in actions invoking collateral estoppel, Virginia does. Full Faith and Credit commands that we apply Virginia law to determine the preclusive effect of the *Amchem* decision. Virginia would not permit appellants to invoke collateral estoppel in order to prevent appellees from relitigating the arbitrability of the dispute over the liability of CCR's Producer Members for the debts of former members. We, therefore, decline appellants' invitation to give the Virginia decision greater effect than it would have in that state." *Id.* at 118, 835 A.2d at 208.

common law collateral estoppel analysis, Maryland is not required to give, and, indeed, may not ordinarily give, any greater preclusive effect to the Virginia judgment than Virginia would give it, and that, in resolving that issue, we must apply Virginia, not Maryland, collateral estoppel law." 384 Md. at 343, 863 A.2d at 934. The majority, unlike the Court of Special appeals, may have discussed common law collateral estoppel, at least from the federal perspective, nevertheless, it grounds its decision on the same basis as the intermediate appellate court. The common thread binding the majority and the Court of Special Appeals is the conclusion, reached by both, that, in this case, Maryland is required to follow the Virginia law of collateral estoppel.

More particularly, the majority posits that its conclusion is required by the reasoning of the Supreme Court, which, it says, "has made clear that, in determining the preclusive effect to be given to the judgment of a State court, the claim and issue preclusion rules of the State that rendered the judgment must govern." 384 Md. at 344, 863 A.2d at 935. It relies on *Board of Public Works v. Columbia College*, 84 U.S. 521, 17 Wall. 521, 21 L.Ed. 687 (1873), which it says first made the point, and subsequent Supreme Court cases, decided pursuant to 28 U.S.C. § 1738, in which the Court addressed the extent to which federal courts must give preclusive effect to State court judgments. *E.g., Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 481–82, 102 S.Ct. 1883, 1897, 72 L.Ed.2d 262, 280 (1982); *Migra v. Warren City School Dist. Bd. Of Ed.*, 465 U.S. 75, 85, 104 S.Ct. 892, 898, 79 L.Ed.2d 56, 64 (1984); *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 1332, 84 L.Ed.2d 274, 281 (1984). Not only are these cases consistent with the Supreme Court's Constitutional full faith and credit cases, the majority submits, 384 Md. at 347–48, nn. 8 and 9, 863 A.2d at 937, nn. 8 and 9, but they have been followed by lower federal courts, state courts and are consistent with our cases. To demonstrate the latter, the majority cites *Weinberg v. Johns-Manville Sales Corp.*, 299 Md. 225, 234, 473 A.2d 22, 27 (1984); *Jessica G. v. Hector M.*, 337 Md. 388, 405, 653 A.2d 922, 931

(1995); *Wernwag v. Pawling*, 5 G. & J. 500, 507 (Md.1833); *Brengle v. McClellan*, 7 G. & J. 434, 440–41 (Md.1836); *Madden v. Cosden*, 271 Md. 118, 125, 314 A.2d 128, 132 (1974). The proposition for which these cases stand, it says, 384 Md. at 347, n. 9, 863 A.2d at 937 n. 9, is, "Under principles of full faith and credit, a state court is generally required to give judgments rendered in other states the same effect that they have in the rendering state." *Weinberg*, 299 Md. at 234, 473 A.2d at 27.

At the outset, I want to be clear, I do not believe that collateral estoppel impacts, in any way, the "effect" of the Virginia judgment. That judgment remains valid and effective, and enforceable against the appellees, just as it would be in Virginia. Application of the doctrine offensively has, to be sure, collateral consequences, but those consequences do not result in the judgment not being given full effect. Those collateral consequences are driven, not by a desire or intent not to give the judgment full faith and credit or effect, but by a policy rationale aimed at case/docket management and the economical and judicious use of scarce judicial resources, counter-balanced, of course, by a desire to ensure that justice is accomplished. That is the same purpose of the collateral estoppel policy adopted by Virginia, I would submit.

By not permitting the use of offensive non-mutual collateral estoppel, Virginia does not render, or, indeed, intend to render, the judgment it entered invalid or ineffective as to the parties as which the judgment was entered, in this case, the appellees; it simply has chosen to utilize its scarce judicial resources in a different manner than Maryland has, to relitigate issues already decided, presumably because, given its conception of it, it believes to do so will serve the ends of justice. I certainly do not believe that the Virginia policy choice is tied to any sense that justice was not done in the case which resulted in the judgment that is the source of the issues sought to be used offensively. There is nothing, moreover, in this record to suggest that the Virginia collateral estoppel policy is premised on an intent to shield those with Virginia judgments from the stricter preclusive collateral estoppel poli-

cies of other States. In any event, to give a foreign judgment full faith and credit does not mean that the receiving court is compelled to subordinate its local policies to the policies and laws of the rendering State. *Williams v. State of North Carolina,* 317 U.S. 287, 296, 63 S.Ct. 207, 212, 87 L.Ed. 279, 284 (1942) ("Nor is there any authority which lends support to the view that the full faith and credit clause compels the courts of one state to subordinate the local policy of that state, as respects its domiciliaries, to the statutes of any other state.").

Critical to the achievement of the policy objective of collateral estoppel is ensuring that the party who will be bound by the doctrine has a fair and full opportunity to litigate the issue in question. While the appellees are unhappy with the result in the Virginia litigation, there is nothing in this record to indicate that they did not have a full and fair opportunity to litigate the case. They have had the benefit of a review of the proceedings by the State's highest court. And, of course, the Virginia defendants, as far as the record reflects, did not try the Virginia case with an expectation that, should they lose, they would receive the benefit of the more lenient Virginia preclusion rule. Such an expectation simply is not, and would not have been, reasonable.

In addition, I am persuaded by *Finley v. Kesling,* 105 Ill.App.3d 1, 60 Ill.Dec. 874, 433 N.E.2d 1112 (1982).[5] That a judgment has no constitutional claim to a greater effect in the state in which enforcement is sought than it had in the state from which it issued, the court noted, does not mean that a state "cannot give greater effect to the adjudication of the issue therein than would the [rendering] state." *Id.* at 1117. It reasoned:

---

5. Although acknowledging that *Finley v. Kesling,* 105 Ill.App.3d 1, 60 Ill.Dec. 874, 433 N.E.2d 1112 (1982) stands for the contrary proposition to that espoused by it, the majority dismisses it, noting that it "is simply not persuasive in light of the overwhelming contrary authority." 384 Md. at 351 n. 11, 863 A.2d at 939 n. 11. The persuasiveness of an authority is not judged, however, by the numerical strength of its supporters, but rather by the logic of its reasoning.

"Finley has cited no case, and we have found none, which holds that a state is barred either by the Full Faith and Credit Clause or by section 1738 of the United States Code of Judiciary and Judicial Procedure (Title 28 U.S.C. s 1738), (which, enacted, pursuant to the constitutional mandate, requires that such acts, records and judicial proceedings have the same full faith and credit as in the courts of the state from which they were taken) from applying its own doctrine of collateral estoppel but instead must give effect not only to the judgment of the first state but to the rules of that state as to when collateral estoppel is to be applied."
*Id.* The *Finley v. Kesling* court cited *Hart v. American Airlines*, 61 Misc.2d 41, 304 N.Y.S.2d 810 (Sup.Ct.1969) [6] and *Clark v. Clark*, 80 Nev. 52, 389 P.2d 69 (1964) as recognizing that the forum state may apply its own rules of collateral estoppel.

In *Hart*, the court put it thusly:

"Defendant's reliance on 'full faith and credit' to defeat the application of collateral estoppel herein is misplaced. This is not a situation where the judgment, as such, of the Texas court is sought to be enforced. What is here involved is a policy determination by our courts that 'One who has had his day in court should not be permitted to litigate the question anew' . . . and, further, refusal 'to tolerate a condition where, on relatively the same set of facts, one fact-finder, be it court or jury' may find a party liable while another exonerates him leading to the 'inconsistent results which are always ways a blemish on a judicial system'. . . . It is in order to carry out these policy determinations in the

---

**6.** The majority is unimpressed by *Hart v. American Airlines*, 61 Misc.2d 41, 304 N.Y.S.2d 810 (Sup.Ct.1969) because it is a trial court decision, involved not with full faith and credit, but comity, as a federal court decision was the prior decision, and it believes that it is inconsistent with a subsequently decided New York Court of Appeals case, *Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985). As indicated, it is the analysis that counts, not the level of court. Notwithstanding that the case is not a full faith and credit case, its analysis is relevant and instructive. Nor do I agree that it is in conflict with *Schultz*.

disposition of cases in this jurisdiction that an evidentiary use is being made of a particular issue determination made in the Texas action."

*Id.*, 61 Misc.2d at 44, 304 N.Y.S.2d at 813–814 (citations omitted). The *Clark* court reached a similar conclusion with respect to the effect of full faith and credit on the question of choice of law:

"However, we do not believe that the constitutional command of full faith and credit poses a choice of law problem.... Rather, the mandate of full faith and credit to judgments is limited to their effect as res judicata, and should not be extended to include questions of choice of law which may later arise."

*Clark*, 389 P.2d at 71 (citations omitted). I am not persuaded by the cases on which the Majority relies. I find many of them inapposite. In *Columbia College*, for example, the Virginia Court of Appeals, at that time the highest court of Virginia, stated in its order that the judgment rendered by the Circuit Court was interlocutory and not final, and thus non-appealable. It was in this context that the Court commented:

"... [T]he complainant, relying upon the decree of the court as evidence of his demand against Withers, invoking for it full faith and credit under the clause of the Constitution, cannot object to the character which the highest court of Virginia has given to it, or insist that it is entitled to any other consideration or weight. No greater effect can be given to any judgment of a court of one State in another State than is given to it in the State where rendered. Any other rule would contravene the policy of the provisions of the Constitution and laws of the United States on the subject."

84 U.S. at 529, 21 L.Ed. at 691 (footnote omitted). The case on which *Columbia College* relied, *Suydam v. Barber*, was to similar effect. Rather than having the limitation of the judgment noted in the court order, the law of Missouri clearly stated the limitation, thus both the plaintiff and the defendant to the action were on notice of that limitation. In this case,

there is neither a notation of the effect of the judgment in the court order, nor is there a law to that effect passed by the Virginia Legislature.

As the majority acknowledges, § 1738 requires federal courts to give the same preclusive effect to state court judgments as those judgments are given in the states in which entered. 384 Md. at 343–44, 863 A 2d at 934–35; *Kremer*, 456 U.S. at 466, 102 S.Ct. at 1889, 72 L.Ed.2d at 270. By contrast, the courts of each State have the right to determine the preclusion rules applicable to judgments in that State. Therefore, I do not agree that the analysis is the same.

The Maryland cases and their reference to giving a foreign judgment the same effect that judgment has in the State from which it issued are not inconsistent with my position. The effect to which they refer pertains to the judgment itself, not to any collateral rules or policy of that State as to when collateral estoppel may be applied. The point is well made by the Court in *Brengle*, wherein the Court stated the scope of the full faith and credit requirement: "the doctrine has never been carried further, than to give to the judgment of another *State*, the same conclusive effect, and obligatory force in every *State* in the Union, that it had in the *State* where it was rendered." 7 G. & J. at 439–40, 1836 WL at *1. Stated differently, quoting 3d *Story's Comm. on the Constitution U.S.* 183:

> " 'If a judgment is conclusive in the *State* where it was pronounced, it is equally conclusive every where. If re-examinable there, it is open to the same inquiries in every other *State*. It is therefore put upon the same footing as a domestic judgment.' The terms 'faith and credit,' as used in the Constitution and act of congress, evidently point to the attributes and qualities, which such records and judicial proceedings shall have as *evidence*, and such appears to have been the construction given to them in the Commentaries."

*Id.* at 440, 1836 WL at *4. The Court also opined on what "effect" does not mean in the full faith and credit context:

" 'can it be supposed, that [the founding fathers] intended, or contemplated to vest in *Congress* the power of giving to a judgment obtained in one *State,* all the legal properties, rights, and attributes, when used in another *State,* to which it was entitled by the law of the *State* where it was rendered? We think that such could not have been the purpose or intention of those enlightened men who framed that instrument; more especially, as such a principle in its tendency and operation, might lead to a conflict and collision between the laws of the different *States,* in the administration of their internal policy, and domestic concerns; and it would in effect, put it in the power of one *State,* to pass laws to regulate and control the administration of assets in another *State;* which would be an anomaly in jurisprudence, and a violation of the genius and spirit of all our institutions.' "

*Id.* at 441–442, 1836 WL at *5.

While I am inclined to believe, given the office of collateral estoppel and the fact that these appellees have once already litigated the identical issue, that the record in this case presents at least a good reason to apply the doctrine of offensive non-mutual collateral estoppel, at the very least, I would remand the case to the Court of Special Appeal for its review, on the merits, unobscured by full faith and credit and other such concepts, of the trial court's refusal to apply the doctrine.

Judge CATHELL joins in the views herein expressed.