COMMERCIAL UNION INSURANCE
COMPANY, Plaintiff, Appellant,

v.

GILBANE BUILDING COMPANY,
Defendant, Appellee.

No. 92–1904.

United States Court of Appeals,
First Circuit.

Heard Dec. 10, 1992.

Decided May 11, 1993.

Michael P. Duffy, with whom Bert J. Capone, John J. O'Connor, and Peabody & Arnold, Boston, MA, were on brief for appellant.

Peter B. Krupp, with whom Thomas R. Murtagh, Joseph P. Crawford–Kelly, and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA, were on brief for appellee.

Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

In this appeal, plaintiff-appellant Commercial Union Insurance Company ("CU") challenges the district court's summary denial of its motion to stay defendant-appellee Gilbane Building Company's ("Gilbane") counterclaim pending arbitration. Finding error in the district court's decision, we reverse.

## I.

### Factual Background

During the latter half of the 1980's, Gilbane, a general contractor, entered into thirteen subcontracts with Thames Valley Steel Corporation ("TVS"), a structural steel subcontractor, under which TVS agreed to perform structural steel work for Gilbane on thirteen separate construction projects in Massachusetts and Rhode Island. On each project, CU acted as surety for TVS, issuing various performance, labor, and material

bonds guarantying TVS's proper completion of its obligations. As such, each of the thirteen construction projects was governed by at least three contracts: (1) the prime contract between Gilbane and the individual owner; (2) the subcontract between Gilbane and TVS; and (3) CU's performance bond.

In 1990, TVS ceased doing business and, as a result, defaulted on its obligations under each of the thirteen subcontracts. Disputes then arose between CU and Gilbane concerning CU's obligations as the guarantor of TVS' performance on these projects. On August 16, 1991, CU commenced this diversity action against Gilbane alleging that Gilbane wrongfully withheld contract balances owed CU in connection with the completion of the first twelve construction projects. In its answer, Gilbane denied CU's allegations and also brought a two-count counterclaim. In Count I of its counterclaim, Gilbane alleged that, in relation to the thirteenth construction project, TVS breached the terms of its subcontract by failing to perform in a good and workmanlike manner, and that CU breached the terms of its performance bond by failing to correct TVS' work. In Count II, Gilbane charged that CU committed unfair and deceptive trade practices in violation of Mass.Gen.Laws Ann. ch. 93A, §§ 2 and 11 (West 1984 and Supp.1992) (hereinafter referred to simply as "ch. 93A"), and unfair claim settlement practices in violation of Mass.Gen.Laws Ann. ch. 176D, § 3(9) (West 1987 and Supp.1992), by failing "to effectuate a prompt, fair and equitable settlement of Gilbane's claims...."

In response to Gilbane's counterclaim, CU filed a reply denying any liability in connection with the thirteenth project and amended its complaint to add a count alleging that Gilbane committed unfair and deceptive trade practices in violation of ch. 93A by withholding an undisputed amount "solely in order to gain leverage with respect to a dispute arising in connection with a different project." At that time, CU also filed a third-party complaint against L. Antonelli Iron Works and The Thompson and Lichter Company, Inc., both of whom had entered into subcontracts with TVS to perform certain services in connection with the thirteenth construction project. In that complaint, CU alleged that the third-party defendants were liable to CU for any amounts Gilbane might recover against CU on Count I of its counterclaim.

On November 6, 1991, CU filed the instant motion to stay Gilbane's counterclaim pending arbitration, arguing that the counterclaim was subject to an express arbitration agreement.[1] Gilbane opposed the motion to stay, contending that the counterclaim was not subject to an arbitration agreement, and in the alternative, that CU had waived its right to arbitrate by filing the instant lawsuit. On May 18, 1992, the district court entered a margin order denying CU's motion to stay. CU appeals from that decision.

## II.

### Discussion

Although not raised by the parties, we first explain the basis of our appellate jurisdiction. Section 3 of the Federal Arbitration Act ("FAA") contains a procedure by which parties to an arbitration agreement may file a motion to stay the trial of arbitrable claims pending arbitration. See 9 U.S.C.A. § 3 (West 1970). Pursuant to that section of the statute, a district court must grant the stay "upon being satisfied that the issue involved ... is referable to arbitration under such an agreement...." The FAA further provides that "[a]n appeal may be taken from ... an order ... refusing a stay under section 3 of this title...." 9 U.S.C.A. § 16(a)(1)(A) (West Supp.1992). As CU is appealing from a denial of a motion to stay under section 3 of the FAA, we therefore have appellate jurisdiction.

---

1. We think it important to emphasize that Count I of the counterclaim concerns only the thirteenth construction project. The other twelve projects, which are the basis for the complaint by CU against Gilbane, are not implicated in the counterclaim. The counterclaim, therefore, can be viewed as separate and distinct from the complaint brought by CU against Gilbane. Neither party has suggested that the dispute as to the twelve other construction projects, which form the basis for CU's complaint, be submitted to arbitration.

## A. Arbitrability

The arbitrability of this dispute turns on the interpretation of contractual terms, a question of law which we can determine in the first instance. *See, e.g., Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir.1989).

### 1. Relevant Contract Language

Gilbane's counterclaim is based upon CU's alleged breach of its performance bond on the thirteenth project ("the Performance Bond"). Thus, the arbitrability of this counterclaim depends upon whether there is language in that contract subjecting disputes between Gilbane and CU to arbitration.

Although the Performance Bond has no language dealing with arbitration, it does contain a clause incorporating the subcontract between Gilbane and TVS ("the Subcontract"), which, in turn, has a clause incorporating the prime contract between Gilbane and the owner of the thirteenth project ("the Prime Contract"). It is the Prime Contract that contains the arbitration clause. That clause reads as follows:

> All claims, disputes and other matters in question arising out of, or relating to this Agreement or the breach thereof, ... shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law by a three-member panel.

The Subcontract, which was drafted by Gilbane, contains a clause incorporating certain provisions of the Prime Contract:

> [Gilbane] shall be bound to [TVS] by the terms of this agre[e]ment, to the extent that the provisions of the contract documents between the owner and [Gilbane] apply to the work of [TVS] as defined in this agreement[.] [Gilbane] shall assume toward [TVS] all the obligations and responsibilities that the owner, by those documents, assumes toward [Gilbane]. [Gil-

bane] shall have the benefit of all rights, remedies, and redress against [TVS] which the owner, by those documents, has against [Gilbane]....[2]

Finally, the Performance Bond has a clause incorporating the Subcontract by reference: "Whereas, [TVS] has by written agreement ... entered into a [S]ubcontract with [Gilbane] ... which [S]ubcontract is by reference made a part hereof...."

### 2. Relevant Law

■ In deciding whether a chain of incorporation rendering Gilbane's counterclaim arbitrable exists within these three contracts, we are mindful of the strong federal policy favoring arbitration agreements, a policy which requires us to resolve "any doubts" concerning arbitrability in favor of arbitration. *See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). *See also J & S Constr. Co., Inc. v. Travelers Indem. Co.*, 520 F.2d 809, 810 (1st Cir.1975) (construing incorporation language in a subcontract broadly in light of "the policy favoring arbitration"). This policy applies "whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone*, 460 U.S. at 25, 103 S.Ct. at 941.

■ In a remarkably similar case, the Sixth Circuit held that a chain of incorporation running through a prime contract, a subcontract, and a performance bond rendered disputes under the performance bond subject to the prime contract's arbitration clause. *Exchange Mut. Ins. Co. v. Haskell Co.*, 742 F.2d 274, 275–76 (6th Cir.1984). Like the Performance Bond at issue here, the bond in that case did not itself contain an arbitration clause. Rather, the bond in *Haskell* incorporated the subcontract by reference, (employing incorporation language almost identical to that involved here), which, in turn, incorporated the prime contract by reference. *Id.* The incorporation clause in

---

**2.** The subcontract defines "contract documents" to include "the agreement between the owner and [Gilbane], the conditions of the agreement

between the owner and [Gilbane], general conditions, supplementary, special and other conditions...."

that subcontract read as follows: "Subcontractor hereby assumes the same obligations and responsibilities with respect to his performance under this Subcontract, that Contractor assumes towards Owner with respect to his performance on the [prime] [c]ontract." *Id.* at 275. The prime contract in *Haskell* contained an arbitration provision almost identical to that in the Prime Contract at issue here. *Id.*

Without reference to the federal policy requiring it to construe any doubts in favor of arbitrability, the Sixth Circuit nevertheless reasoned that the incorporation language in the performance bond and subcontract was broad enough to include the prime contract's arbitration agreement:

> Here, the performance bond specifically referred to and incorporated the subcontract. The subcontract provides that the same obligations and responsibilities apply in the subcontract as apply in the [prime] contract. And, finally, the [prime] contract provides that there is a duty to arbitrate. Thus, the performance bond incorporates by reference the subcontract, the subcontract incorporates by reference the [prime] contract[,] and hence[,] the duty to arbitrate.

*Id.* at 276 (relying on *J & S Constr.*, 520 F.2d at 810).

**3.** In support of its contention that the language in the Subcontract should be read narrowly, Gilbane points to the clause in that contract expressly granting Gilbane "the benefits of all rights, remedies, and redress against [TVS] which the owner, by [the Prime Contract], has against [Gilbane]." Because the Subcontract does not contain a parallel clause expressly granting TVS "the benefit of all rights, remedies, and redress" under the Prime Contract, Gilbane contends that the parties did not intend for TVS to have the same right to subject disputes under this contract to arbitration. We do not agree.

First, this argument ignores the immediately preceding clause which states that Gilbane "shall assume toward [TVS] all the obligations and responsibilities that the owner, by [the Prime Contract], has against [Gilbane]." As explained above, we interpret this clause to impose upon Gilbane the duty to arbitrate "all disputes relating to [the Prime Contract]," an obligation assumed by the owner under the Prime Contract. Second, adopting Gilbane's cramped reading of this language would run counter to the clearly enunciated federal policy of interpreting "any

If anything, the language in the Subcontract incorporating the terms of the Prime Contract is even broader than that in the *Haskell* subcontract. The Subcontract provides that, to the extent the Prime Contract (with all its attendant conditions) applies to the work of TVS, Gilbane "shall assume toward [TVS] *all* the obligations and responsibilities" that the owner assumed toward Gilbane under the Prime Contract. (Emphasis added). The Subcontract further states that "[Gilbane] shall have the benefit of all rights, remedies, and redress against [TVS] which the owner, by [the contract documents], has against [Gilbane]." The parties do not dispute that one of the obligations which Gilbane assumed toward the owner under the Prime Contract was to submit all disputes arising out of the contract to arbitration. Nor do they dispute that the bundle of "rights, remedies, and redress" given the owner under the Prime Contract included the right to submit all claims relating to that contract to arbitration. Accordingly, we find that the Subcontract bound Gilbane to arbitrate disputes relating to the work of TVS.[3] Because the Performance Bond explicitly incorporated by reference the terms of the Subcontract, we further find that Gilbane and CU similarly bound themselves to submit disputes arising under the Performance Bond to arbitration. To the extent that the district court held otherwise, we reverse.[4]

doubts" in contractual language in favor of arbitration. *Moses H. Cone*, 460 U.S. at 24–25, 103 S.Ct. at 941. Finally, because Gilbane drafted the subcontract, we construe any ambiguities in that contract against it. *See, e.g., LFC Lessors, Inc. v. Pacific Sewer Maintenance Corp.*, 739 F.2d 4, 7 (1st Cir.1984).

**4.** To support its position that the district court's refusal to grant the stay was correct, Gilbane relies upon a series of cases which, it asserts, stand for the proposition that prime contract provisions unrelated to the work of the subcontractor are not incorporated by reference into a subcontract. *See Washington Metro. Area Transit Auth. v. Norair Eng'g Corp.*, 553 F.2d 233, 235–36 (D.C.Cir.1977); *John W. Johnson, Inc. v. Basic Constr. Co., Inc.*, 429 F.2d 764, 774–75 (D.C.Cir.1970); *United States v. Fryd Constr. Corp.*, 423 F.2d 980, 983–84 (5th Cir.), *cert. denied,* 400 U.S. 820, 91 S.Ct. 38, 56, 27 L.Ed.2d 48 (1970); *United States Steel Corp. v. Turner Constr. Co.*, 560 F.Supp. 871, 873–74 (S.D.N.Y. 1983). None of these cases, however, involved the incorporation of an arbitration clause. In-

### B. Waiver

■ Gilbane alternatively contends that, even if the counterclaim is arbitrable, CU waived its right to arbitrate that claim based upon its pretrial participation in this lawsuit. This contention we find meritless.

In deciding this issue, we first discuss the appropriate standard of review. As the district court decided the arbitrability question by margin order, we have no predicate factual findings to review. In fact, it is possible that the district court did not reach the question of waiver but decided against CU solely on the basis of its interpretation of the contractual language. In any event, the facts concerning CU's pretrial participation in the lawsuit are undisputed. As a result, the question of waiver is one of law, and we review it *de novo*. *See Page v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*, 806 F.2d 291, 294 n. 2 (1st Cir.1986), *overruled on other grounds sub nom. Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987).

In deference to the policies favoring arbitration, "courts have stated that 'waiver is not to be lightly inferred, and mere delay in seeking arbitration without some resultant prejudice to a party cannot carry the day.'" *See id.* at 293 (quoting *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2d Cir.1985)). *See also Sevinor v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 807 F.2d 16, 19 (1st Cir.1986) ("In order for plaintiffs to prevail on their claim of waiver, they must show prejudice."); *J & S Constr.*, 520 F.2d at 809–10 (upholding district court's finding of no waiver where there had been "no showing of prejudice").

Although Gilbane made no claim below that it would be prejudiced by a stay of its counterclaim, it asserts on appeal that it would suffer prejudice on two bases: (1) that it could not properly "defend" Count I (the contract claim for amounts allegedly owed CU on twelve of the thirteen construction projects) and Count II (CU's ch. 93A claim) without its counterclaim; and (2) that it would be forced into duplicative litigation. We discuss these contentions in turn.

Gilbane first argues that it would suffer prejudice from having to defend against Count I of CU's complaint without its counterclaim. Accepting this contention would require, in essence, a finding that the thirteen construction projects are factually inseparable. This is simply not the case. Suppose, for instance, that the counterclaim proceeds to arbitration and is decided in Gilbane's favor. Assume further that the underlying lawsuit results in an award to CU. Under that scenario, the arbitration award could act as a stipulated setoff from the amount awarded CU in district court.[5] We are unable to imagine a scenario in which Gilbane would suffer prejudice from having to defend Count I of CU's complaint in the underlying lawsuit without its counterclaim. Nor has Gilbane outlined such a scenario.[6] We therefore find unpersuasive its belated contention that one might exist.

Gilbane also asserts that it would suffer prejudice by having to defend against Count II of CU's complaint without its counterclaim. Again, Gilbane has failed to provide an example of *how* it might be prejudiced. It appears to be arguing, instead, that it would be judicially inefficient to litigate CU's ch.

---

deed, in one of the cases relied upon by Gilbane, the court explicitly distinguished cases involving arbitration clauses as invoking the "congressional policies favoring arbitration...." *See Washington Metro.*, 553 F.2d at 236. In light of *Haskell*, a case on all fours with this one, we find Gilbane's reliance upon this line of cases unpersuasive.

5. We note that Gilbane's attorney conceded as much during oral argument.

6. Gilbane also argues that, because it pleaded the substance of its counterclaim as an affirmative defense in its answer to the complaint, it should be permitted to litigate the substance of that claim in the underlying action. Whether we characterize the substance of Gilbane's claim as

a "counterclaim" or a "setoff defense," however, makes no difference for the purposes of determining whether Gilbane will theoretically be *prejudiced* by severing it from the underlying lawsuit. Second, and more important, Gilbane is, in our opinion, relying upon creative pleading to make an end run around an arbitration agreement. We have previously rejected a party's *reliance upon procedural gamesmanship to avoid* the dictates of an arbitration agreement. *Cf. Hilti, Inc. v. Oldach*, 392 F.2d 368, 373 n. 2 (1st Cir.1968) ("If arbitration defenses could be foreclosed [by creative use of the joinder rules], the utility of such agreements would be seriously compromised."). We do so again today.

93A claim in one forum and Gilbane's ch. 93A claim in another.[7] While Gilbane may be correct, we fail to see how any resulting judicial inefficiency would prejudice Gilbane.[8] *Cf. Page*, 806 F.2d at 294–95 (finding no prejudice despite plaintiffs' claim that compelled arbitration would force them to "restart the entire [pretrial preparation] process before a new tribunal" almost two years after complaint was filed).

Gilbane also argues that it would suffer prejudice by having to litigate the same facts in two separate proceedings, and having "to incur increased costs as a result of having to proceed in two arenas." This argument rests on the faulty premise that litigation of the counterclaim and CU's underlying claims would require the adjudication of "identical factual and legal issues." *See supra* p. 390. Moreover, any added costs that Gilbane would incur to arbitrate its counterclaim were bargained for by Gilbane. As such, Gilbane's final attempt to persuade us that it will suffer undue prejudice falls well short of the mark.

### III.

### *Conclusion*

In sum, we find that Gilbane's counterclaim was subject to an express agreement to arbitrate, and that CU did not waive its right to arbitrate that claim. Accordingly, we reverse the district court's denial of CU's motion to stay Gilbane's counterclaim pending arbitration and remand for proceedings consistent with this opinion.

***Reversed and remanded. No costs.***

---

**7.** At one point in its brief, Gilbane states that it would "be at risk of inconsistent verdicts...." Gilbane has not, however, offered either an explanation of this perfunctory assertion or an example of a scenario in which it could occur. As such, we do not address it further. *See United States v. St. Cyr*, 977 F.2d 698, 701 (1st Cir.1992) (reiterating well settled rule in this circuit that arguments adverted to on appeal in "a perfunctory manner, unaccompanied by some developed argumentation," are deemed waived) (quoting *Ryan v. Royal Ins. Co. of America*, 916 F.2d 731, 734 (1st Cir.1990)).

**8.** In any event, considerations of judicial efficiency are not a sufficient basis on which to affirm the district court's denial of the motion to stay. *See, e.g., Seguros Banvenez, S.A. v. S/S Oliver Drescher*, 761 F.2d 855, 862 (2d Cir.1985) (holding that a court "may not refuse to grant a stay [of a claim pending arbitration] based on considerations of judicial economy"); *Surman v. Merrill Lynch, Pierce, Fenner & Smith*, 733 F.2d 59, 63 (8th Cir.1984) (similar); *Dickinson v. Heinold Sec., Inc.*, 661 F.2d 638, 644–45 (7th Cir.1981) (similar).