REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 20

September Term, 2015

_____

SCHNEIDER ELECTRIC BUILDINGS
CRITICAL SYSTEMS, INC.

v.

WESTERN SURETY COMPANY

_____

Krauser, C.J.,
Berger,
Zarnoch, Robert A.
     (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Krauser, C.J.

_____

Filed:  November 30, 2016

The issue before us is whether Western Surety Company, the appellee, is bound by the mandatory arbitration clause of an agreement between Schneider Electric Buildings Critical Systems, Inc., the appellant, and National Control Services, Inc. ("NCS"), as that agreement was later incorporated by reference into a subcontract between Schneider Electric and NCS, which was thereafter incorporated by reference into a performance bond issued by Western Surety on behalf of NCS for work it was to perform for Schneider Electric.

The aforementioned agreement between Schneider Electric and NCS, containing the arbitration clause at issue, in this appeal, was entitled the "Master Subcontract Agreement." Its purpose was to enable Schneider Electric, "from time to time," to "engage the services of [NCS] to provide labor, material, equipment and services . . . in connection with construction projects," and its terms were to cover all future subcontracts between them. Of particular relevance to the issue before us, the Master Subcontract Agreement provided that any disputes that might arise between those two corporate entities, which could not be resolved by "good faith negotiations," must be submitted to arbitration.

One year later, Schneider Electric was retained to assist in the building of a facility at Aberdeen Proving Ground, whereupon it entered into a subcontract agreement with NCS, in accordance with the parties' Master Subcontract Agreement, providing that NCS was to perform certain work at the construction site of that facility. The subcontract required NCS to furnish a performance bond, which it did. The issuer of that bond was Western Surety. And, significantly, the bond incorporated by reference the subcontract

between Schneider Electric and NCS, which had incorporated by reference the Master Subcontract Agreement between those two parties, with its mandatory arbitration clause.

When NCS thereafter declined to perform the construction required by the subcontract, as a result of a payment dispute, Schneider Electric filed, as provided by the parties' Master Subcontract Agreement, a demand for arbitration. Although that demand, initially, named only NCS as a respondent, it was subsequently amended to include Western Surety, as a co-respondent, on the grounds that the performance bond, issued by Western Surety, incorporated by reference the subcontract, which, in turn, had incorporated by reference the Master Subcontract Agreement, with its mandatory arbitration clause, and thereby purportedly bound Western Surety to that clause.

In response to its belated inclusion into Schneider Electric's demand for arbitration, Western Surety filed a petition, in the Circuit Court for Howard County, to stay that arbitration and for a declaratory judgment, avowing, among other things, that it was not a party to Schneider Electric's and NCS' agreement to arbitrate their disputes and therefore could not be compelled to participate in the arbitration proceeding pending between them; it asserted, moreover, that Schneider Electric had breached the performance bond and that that breach had relieved Western Surety of any liability under that instrument. Then, following the transfer of this dispute from Howard County to Harford County, the Circuit Court for Harford County granted partial summary judgment in favor of Western Surety, concluding that, under either federal or state law, Western Surety was not subject to the arbitration provision of the incorporated Master Subcontract Agreement and therefore

2

could not be compelled to participate in the pending arbitration proceeding between Schneider Electric and NCS.

In so ruling, the Harford County circuit court cited three grounds for its decision: first, the words of the performance bond evinced an intent by Western Surety to guarantee the performance of all construction work to be performed by NCS, but not all contractual obligations undertaken by NCS, pursuant to the subcontract; second, the arbitration clause of the Master Subcontract Agreement, even if ultimately incorporated by reference into the performance bond, mandated arbitration only as to disputes between Schneider Electric and NCS; and, third, to rule otherwise, would, in effect, read out of the performance bond language expressly providing for a judicial resolution of any dispute, involving the bond, that might arise.

Schneider Electric then noted this appeal, contending that the Harford County circuit court's ruling was in error for two reasons: first, by agreeing, in the performance bond, to "jointly and severally" bind themselves to the performance of the subcontract between Schneider Electric and NCS, both Western Surety and NCS were thereby bound to comply with the arbitration clause incorporated by reference into that subcontract; and, second, because the performance bond incorporated by reference that subcontract, Western Surety was rendered subject to the arbitration clause. Finding no merit to either claim of error, we shall affirm the judgment of the circuit court.

3

# I.

In May 2009, Schneider Electric[1] and NCS entered into a "Master Subcontract Agreement," in which the parties agreed, as noted, that NCS would "provide labor, material, equipment and services necessary to perform work in connection with construction projects, from time to time[.]" The Master Subcontract Agreement set forth, among other things, the terms and conditions that would apply to all future subcontracts between the two companies. It also included a provision, which is the crux of this appeal, that any dispute between them would be subject to arbitration, if they were unable to negotiate a resolution of that dispute.

Several months later, on August 14, 2009, Clark Construction Group, LLC, which is not a party to this matter, entered into a contract with the United States Army Corps of Engineers to build a replacement facility for medical research at Aberdeen Proving Ground in Harford County, Maryland. The following October, Clark Construction, now the general contractor for that construction project, contractually retained the services of Schneider Electric to assist in the construction of that facility.

Seven months after Schneider Electric was engaged, by Clark Construction, as a subcontractor for the construction project, Schneider Electric, pursuant to its Master Subcontract Agreement with NCS, entered into a subcontract with NCS, to perform work

---

[1] When the parties entered into the Master Subcontract Agreement, Schneider Electric was known as TAC Critical Systems, Inc. In July 2011, more than two years after the execution of the Master Subcontract Agreement, TAC Critical Systems changed its name to Schneider Electric Buildings Critical Systems, Inc.

for that project. The subcontract incorporated by reference the Master Subcontract Agreement, which contained the arbitration clause at issue.

Specifically, the subcontract provided that NCS would perform "electrical and pneumatic installation" work at the Aberdeen facility. For that work, NCS was to be paid $2,050,000, "in installments as the Work progresses."

The subcontract also required NCS to furnish a performance bond, designating Schneider Electric as the obligee, for 100 per cent of the "Subcontract value," that is, $2,050,000.[2] NCS subsequently obtained that bond from Western Surety. The performance bond, issued by Western Surety, at NCS' request, was an American Institute of Architects ("AIA") form A312[3] and bound Western Surety and NCS to Schneider Electric "for the performance of the Construction Contract," which was incorporated by reference into the performance bond. The term "Construction Contract," as defined by the performance bond, included the subcontract, between Schneider Electric and NCS, and thereby the Master Subcontract Agreement between those two entities, with its mandatory arbitration clause, which had been incorporated by reference into the subcontract.

---

[2] Although the court below stated, in its opinion, that the bond amount was $2,600,000, the bond and pleadings below indicate the amount was $2,050,000.

[3] The American Institute of Architects is an organization which, among other things, "[s]ets the industry standard in contract documents with more than 100 forms and contracts used in the design and construction industry." See "About the AIA," available at http://www.aia.org/about/index.htm (last visited Nov. 7, 2016).

The subcontract specified that NCS' work would begin on May 25, 2010 and conclude by May 31, 2013. As the work progressed, numerous change orders eventually increased the amount to be paid NCS, by Schneider Electric, from $2,050,000 to $2,309,883, and extended the date that NCS was to complete its work from May 31, 2013 to February 28, 2014.[4]

In the summer of 2013, a dispute arose between Schneider Electric and NCS concerning payment for work NCS had purportedly performed. NCS claimed it was owed approximately $410,000, by Schneider Electric, for various progress payments, claims, and change orders. When Schneider Electric rejected NCS' demand for payment, the parties attempted, as required by their Master Subcontract Agreement, which had been incorporated by reference into their subcontract, to resolve their dispute "through good faith negotiations and settlement." When those efforts proved unavailing, NCS, on August 30, 2013, abandoned the job site, notwithstanding a provision in the Master Subcontract Agreement requiring it to "continue to diligently perform the Work and maintain the progress schedule (without waiving its claims) despite the pendency of any dispute or any arbitration or litigation proceeding[.]"

Upon learning of NCS' cessation of work, Schneider Electric promptly sent an initial notice of default to both NCS and Western Surety, advising them of what Schneider Electric believed to be a breach of contract by NCS. After two months had passed and

---

[4] There were fourteen change orders issued by Schneider Electric to NCS, as well as a promise to issue an additional change order, extending the date for completion of the work from September 19, 2013 to February 28, 2014, pending the conclusion of negotiations between Schneider Electric and Clark Construction.

6

NCS had still not resumed its work at the job site, Schneider Electric, on October 25, 2013, sent a final notice of default to both NCS and Western Surety, declaring that Schneider Electric intended to "terminate for cause" the subcontract between it and NCS, that Schneider Electric would "proceed to complete NCS' work in an expeditious manner using manpower supplied by other electrical subcontractors," and that NCS and Western Surety would "remain liable for all costs and expenses incurred" by Schneider Electric to complete NCS' work. Schneider Electric then, on November 12, 2013, notified both NCS and Western Surety that the NCS subcontract had "been terminated for cause pursuant to Section 18.3" of the Master Subcontract Agreement, which permitted it to do so if NCS abandoned the work it was contractually required to perform.

Because NCS, as of August 30, 2013 (the date it left the job site), had performed only 70 per cent of the work required under the subcontract, Schneider Electric hired other electrical subcontractors to complete the remaining work. It, ultimately, paid those subcontractors approximately $2,000,000 to fulfil NCS' contractual obligations, which further fueled the dispute between the parties, as that amount substantially exceeded the amount that NCS was to be paid upon the completion of the work it had not yet performed, when it ceased any further activity at the construction site. In fact, according to Schneider Electric, NCS' breach of the subcontract had caused it to suffer nearly $1,500,000 in damages, which was the difference between the approximately $2,000,000 it paid others to complete the work NCS was to perform under the subcontract and the approximately $500,000 NCS was to be paid had it fulfilled its contractual obligations.

7

In February 2014, Schneider Electric filed a demand for arbitration, with the American Arbitration Association, naming NCS as the sole respondent and claiming damages in the amount of $1,473,100 as well as attorneys' fees, interest, and costs. Then, two months later, it amended that demand, to include Western Surety as a co-respondent.

Finding, itself, now a party to the arbitration demanded by Schneider Electric, Western Surety filed, in response to that demand, a petition, in the Circuit Court for Howard County, seeking both a stay of arbitration and a declaratory judgment. Specifically, Western Surety requested, invoking Courts and Judicial Proceedings Article ("CJ"), § 3-208,[5] that the circuit court stay arbitration "with respect to any claims asserted by" Schneider Electric against it because it was not, it averred, a party to any arbitration agreement with Schneider Electric or NCS or to any agreement between them. Western

---

[5] Maryland Code (1974, 2013 Repl. Vol.), Courts and Judicial Proceedings Article ("CJ"), § 3-208 provides:

> (a)  If a party denies existence of the arbitration agreement, he may petition a court to stay commenced or threatened arbitration proceedings.
>
> (b)(1)  A petition to stay arbitration shall be filed with the court where a petition to order arbitration has been filed.
> (2)  If a petition for order to arbitrate has not been filed, the petition to stay arbitration may be filed in any court subject to venue provisions of Title 6 of this article.
>
> (c)  If the court determines that existence of the arbitration agreement is in substantial and bona fide dispute, it shall try this issue promptly and order a stay if it finds for the petitioner. If the court finds for the adverse party, it shall order the parties to proceed with arbitration.

Surety further requested that the court "issue a declaratory judgment with respect to the legal relations between" it and Schneider Electric and, in so doing, to specify the reasons that it, Western Surety, could not be required to participate in the arbitration currently pending between Schneider Electric and NCS, as well as to specify any "suretyship defenses" Western Surety could invoke, were Schneider Electric to bring a claim against it under the performance bond, should it prevail in the pending arbitration proceeding with NCS.

In reply, Schneider Electric filed a motion to dismiss the state court action, brought by Western Surety, on the grounds of improper venue. Although Western Surety opposed that motion, it did agree to Schneider Electric's request for a change of venue, which led the Howard County court to subsequently transfer this matter to the Circuit Court for Harford County. *See* Md. Rule 2-327(c) (authorizing a circuit court, on motion of any party, to transfer an action "to any other circuit court where the action might have been brought if the transfer is for the convenience of the parties and witnesses and serves the interests of justice").

At the same time that Schneider Electric moved to dismiss the state court proceedings, it filed a petition, in the United States District Court for the District of Maryland, seeking to compel Western Surety to arbitrate their dispute. The federal district court dismissed that petition, citing the "abstention doctrine," promulgated by the Supreme Court, in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), which permits a federal district court to dismiss a federal action, when "the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of

9

the issues between the parties." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983).

Later that year, following the transfer of the case to the Harford County circuit court, Western Surety, in September 2014, filed, in that court, a motion for partial summary judgment, asserting that, because there was no agreement to arbitrate between it and Schneider Electric, it was entitled to judgment as a matter of law as to its request for a stay of arbitration. The granting of that motion by the Harford County circuit court prompted the filing of this interlocutory appeal[6] by Schneider Electric.

## II.

Having not been stayed during the pendency of this appeal, arbitration proceedings, to which only Schneider Electric and NCS were parties, continued without interruption. In fact, shortly after the parties' presentation of oral argument, before this Court, those proceedings concluded with a determination, by the arbitrator, that NCS had breached its subcontract with Schneider Electric, whereupon Schneider Electric was awarded, by the arbitrator, a total of $1,653,924.21 in damages, attorneys' fees, arbitrator's fees, and costs that Schneider Electric had incurred. Following that decision, Western Surety promptly filed a motion to dismiss this appeal, contending that, because the dispute between Schneider Electric and Western Surety was, principally, whether Western Surety was

---

[6]This appeal was filed, pursuant to Courts and Judicial Proceedings Article ("CJ"), § 12-303(3)(ix), which permits an interlocutory appeal from an order "[g]ranting a petition to stay arbitration pursuant to § 3-208."

contractually obligated to submit to arbitration and, as that arbitration had concluded, the instant appeal is now moot and warrants dismissal.

"A question is moot if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide." *Falik v. Hornage*, 413 Md. 163, 186 (2010) (citation and quotation omitted). Although the arbitration between Schneider Electric and NCS has, indeed, ended, the issue of whether Schneider Electric may seek payment of that award from Western Surety via arbitration is still before us. That issue was understandably neither addressed nor resolved during the arbitration proceedings between Schneider Electric and NCS. It therefore remains an "existing controversy" between the parties and, in fact, lies at the heart of this appeal. Accordingly, we shall deny Western Surety's motion to dismiss and proceed to the merits of the issue presently before us.

**III.**

Under Maryland Rule 2-501(f), a circuit court may grant summary judgment, if there is "no genuine dispute as to any material fact," and "the party in whose favor judgment is entered is entitled to judgment as a matter of law." "Because a grant of summary judgment is predicated upon a ruling on a question of law and not a dispute of fact, our review is de novo." *Stein v. Pfizer Inc.*, 228 Md. App. 72, 85 (2016) (citation omitted), *cert. denied*, __ Md. __, 2016 WL 5724833 (Sept. 29, 2016). Keeping that standard of review in mind, we turn now to the first issue we have been asked to decide and, that is, whether we must apply federal law, specifically, the Federal Arbitration Act

11

and its attendant presumption in favor of arbitration, in determining whether Western Surety is bound contractually to arbitrate, as Schneider Electric contends, or state contract law, as Western Surety claims.

Preliminarily, we note that the court below did not address whether the contracts at issue, in this appeal, involved interstate commerce and, consequently, it never determined whether the Federal Arbitration Act applied to the instant controversy. *See* 9 U.S.C. § 1 (defining "commerce," for purposes of the Federal Arbitration Act, as including "commerce among the several States"). Nor was it necessary that it do so, given that it found that, under either federal or state law, Western Surety was not contractually bound to arbitrate any disputes arising from the performance bond it had issued because, regardless of which Act, federal or state, applies, state law governs the issue of contract formation. We agree.

The Supreme Court first annunciated this principle in *Perry v. Thomas*, 482 U.S. 483 (1987), and then later reiterated it, in *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009), to clear up an apparent misreading of Section 2 of the Federal Arbitration Act by a number of federal and state courts.

Section 2 of that federal Act states that a written arbitration provision "in any . . . contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, **save upon such grounds as exist at law or in equity for the revocation of any contract**," 9 U.S.C. § 2 (emphasis added), an ambiguous clause, to be sure. Then, in *Perry v. Thomas*, 482 U.S. 483, the Supreme Court indicated, apparently not plainly enough, that, while the former clause — "in any . . . contract evidencing a transaction

involving commerce . . . shall be valid, irrevocable, and enforceable" — generally provides that "[a]n agreement to arbitrate is valid, irrevocable, and enforceable, *as a matter of federal law*," the language that follows — "save upon such grounds as exist at law or in equity for the revocation of any contract" — provides that "state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Id.* at 492-93 n.9.

Nonetheless, a significant number of federal and state courts, in addressing whether non-signatories to contracts containing arbitration clauses may either compel a signatory or be compelled by a signatory to arbitrate disputes arising under those contracts, have misconstrued Section 2 and mistakenly concluded that it provides that enforceability of an arbitration clause by or against a non-signatory is to be resolved, in accordance with federal common law. *See*, *e.g.*, *R.J. Griffin & Co. v. Beach Club II Homeowners Assoc.*, 384 F.3d 157, 160 n.1 (4th Cir. 2004); *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417 n.4 (4th Cir. 2000); *MS Dealer Service Corp. v. Franklin*, 177 F.3d 942, 947-48 (11th Cir. 1999); *Grundstad v. Ritt*, 106 F.3d 201, 204-05 (7th Cir. 1997); *Commercial Union Ins. Co. v. Gilbane Building Co.*, 992 F.2d 386, 388-89 (1st Cir. 1993); *United States Fidelity & Guaranty Co. v. West Point Constr. Co.*, 837 F.2d 1507, 1508 (11th Cir. 1988) (per curiam); *Exchange Mut. Ins. Co. v. Haskell Co.*, 742 F.2d 274, 275-76 (6th Cir. 1984) (per curiam); *Rashid v. Schenck Const. Co., Inc.*, 438 S.E.2d 543, 547 (W. Va. 1993); *St. Paul Fire & Marine Ins. Co. v. Woolley/Sweeney Hotel No. 5*, 545 So. 2d 958 (Fla. Dist. Ct. App. 1989) (per curiam).

13

This misreading of Section 2 has engendered much confusion among many state courts, including Maryland's Court of Special Appeals. *See*, *e.g.*, *Thompson v. Witherspoon*, 197 Md. App. 69, 81 (2011) ("Under the [Federal Arbitration Act], courts look to substantive provisions of state law regarding threshold issues of the validity, revocability, or enforceability of contracts, but to federal law to resolve issues as to whether a non-signatory to a contract can enforce, or be bound by, an arbitration provision in a contract signed by other parties.") (citation omitted); *Case Handyman and Remodeling Servs., LLC v. Schuele*, 183 Md. App. 44, 57 (2008) ("To resolve the issue whether a non-signatory can enforce a contract's arbitration provision under the doctrine of equitable estoppel, courts look to the federal substantive law of arbitrability."), *vacated on other grounds*, 412 Md. 555 (2010).

In 2009, the Supreme Court laid to rest this misinterpretation of that section of the Federal Arbitration Act, in *Arthur Andersen LLP v. Carlisle*, *supra*, 556 U.S. 624. There, it explained that when, as in this case, a question arises as to whether an arbitration clause may be enforced by or against non-parties to a contract containing such a clause, "'traditional principles' of state law," which "allow a contract to be enforced by or against non[-]parties . . . through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel,'" provide the answer to

14

that question.  *Id.* at 631 (quoting 21 R. Lord, *Williston on Contracts* § 57:19, at 183 (4th ed. 2001)).[7]

Moreover, in the past few years, several federal courts of appeals, consistent with the *Carlisle* Court's relatively recent admonition, have candidly conceded their mistaken impression that federal common law controls in such situations.  *See*, *e.g.*, *Crawford Prof. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 255 (5th Cir. 2014) (recognizing that "prior decisions applying federal common law, rather than state contract law, to decide" whether an arbitration clause may be enforced by or against nonparties to the contract were in error); *Lawson v. Life of the South Ins. Co.*, 648 F.3d 1166, 1170-71 (11th Cir. 2011) (declaring that many of that circuit's prior "decisions involving the question of whether a non-party can enforce an arbitration clause against a party have not made clear that the applicable state law provides the rule of decision for that question").  We now join those courts in stressing that, under the Federal Arbitration Act, as interpreted by the Supreme Court, the question of whether an agreement to arbitrate binds a non-signatory is a question of state contract law.  *Arthur Andersen LLP v. Carlisle*, 556 U.S. at 631; *First Options of*

---

[7] The question at issue in *Arthur Andersen* was whether a non-signatory to a contract, containing an arbitration clause, could, nonetheless, invoke provisions, in the Federal Arbitration Act, entitling "litigants in federal court to a stay of any action that is 'referable to arbitration under an agreement in writing'" as well as to seek an appeal from a district court's order denying such a stay.  *Arthur Andersen*, 556 U.S. at 625 (quoting 9 U.S.C. § 3) (citing 9 U.S.C. § 16).  The Supreme Court held that, "if the relevant state contract law" permits a non-signatory to enforce such an arbitration agreement, that non-signatory is entitled to seek a stay, under 9 U.S.C. § 3, as well as to appeal, under 9 U.S.C. § 16, from the denial of such a stay.  *Id.* at 632.

*Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Perry v. Thomas*, 482 U.S. at 492-93 n.9.

Finally, if the Maryland Uniform Arbitration Act, rather than the Federal Arbitration Act, applies in this case, we, of course, reach the same conclusion, that is, state contract law, not federal law, governs whether an agreement to arbitrate binds a non-signatory.[8] *See Cheek v. United Healthcare of the Mid-Atlantic, Inc.*, 378 Md. 139, 147 (2003) (observing that, under the Maryland Uniform Arbitration Act,[9] the "determination of whether there is an agreement to arbitrate . . . depends on contract principles since arbitration is a matter of contract").

---

[8] Western Surety is domiciled in South Dakota, as stated on the website of its corporate parents, CNA Surety and CNA Financial Corporation. Furthermore, Schneider Electric is a Delaware corporation, with its principal place of business in Maryland. Moreover, the work to be performed by NCS, under its subcontract with Schneider Electric, was to be done at a federal military installation, Aberdeen Proving Ground. For all of these reasons, we would conclude that, were it necessary for our decision, the Federal Arbitration Act applies in this case.

[9] Courts and Judicial Proceedings Article, § 3-206(a), part of the Maryland Uniform Arbitration Act, provides:

> Except as otherwise provided in this subtitle, a written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy arising between the parties in the future is valid and enforceable, and is irrevocable, **except upon grounds that exist at law or in equity for the revocation of a contract.**

(Emphasis added.) The bolded language in the Maryland Act is virtually identical to the corresponding language in the Federal Arbitration Act.

16

## IV.

We now turn to the issue, which is the fulcrum of this case: whether, under Maryland contract law, Western Surety, in effect, agreed to arbitrate any disputes between it and Schneider Electric, because the performance bond, issued by Western Surety, on behalf of NCS, incorporated by reference the subcontract, which, in turn, incorporated by reference the Master Subcontract Agreement, with its arbitration clause, to which only Schneider Electric and NCS were parties.

"Maryland follows the objective theory of contract interpretation," *Nationwide Mut. Ins. Co. v. Regency Furniture, Inc.*, 183 Md. App. 710, 722 (2009), according to which a "court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated." *Hartford Accident and Indemnity Co. v. Scarlett Harbor Associates Ltd. Partnership*, 109 Md. App. 217, 291 (1996) ("*Scarlett Harbor I*"), *aff'd*, 346 Md. 122 (1997) ("*Scarlett Harbor II*"). Moreover, "[w]here the contract comprises two or more documents, the documents are to be construed together, harmoniously, so that, to the extent possible, all of the provisions can be given effect." *Regency Furniture*, 183 Md. App. at 722-23 (quoting *Rourke v. Amchem Prods., Inc.*, 384 Md. 329, 354 (2004)).

The latter principle of contract interpretation bears particular relevance to the issue before us, because the agreement between Western Surety and Schneider Electric is the product of principally three documents: the performance bond together with the subcontract and the Master Subcontract Agreement, with its arbitration clause, the former of which incorporates the latter two.

17

Paragraph 1 of the performance bond states:

> [NCS] and [Western Surety], jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to [Schneider Electric] for the performance of the Construction Contract [which includes both the Subcontract and the Master Subcontract Agreement], which is incorporated herein by reference.

According to Schneider Electric, paragraph 1 of the bond binds Western Surety to submit to arbitration all disputes, arising under what is referred to above as the "Construction Contract," first, because it "jointly and severally" binds Western Surety to ensure "the performance of the Construction Contract," which includes, insists Schneider Electric, compliance with the arbitration clause, if invoked, and, second, because paragraph 1 of the bond incorporates by reference the subcontract, which, in turn, incorporates by reference the Master Subcontract Agreement and thus its arbitration clause.

**A.**

Schneider Electric's assertion that Western Surety, by "jointly and severally" binding itself to "the performance of the Construction Contract," as stated in paragraph 1 of the performance bond, also bound itself to the incorporated Master Subcontract Agreement's arbitration clause, ignores the context of those words as well as misconstrues the term "performance." The Master Subcontract Agreement states that Schneider Electric "desires to engage the services of [NCS] to provide labor, material, equipment and services necessary to **perform work** in connection with construction projects, from time to time, in accordance with the terms and conditions set forth in" the Master Subcontract Agreement. (Emphasis added.) As the purpose of the Master Subcontract Agreement (and the

18

subcontract, which incorporated that agreement by reference) was to ensure that NCS would "perform work," prescribed by that agreement, it is with that purpose in mind that the term "performance" should be construed. *Ocean Petroleum Co. v. Yanek*, 416 Md. 74, 88 (2010) (citation and quotation omitted). The arbitration clause, on the other hand, is nothing more than an enforcement mechanism, which may never come into play, if all parties proceed as agreed.

Moreover, the paragraphs of the bond, which immediately follow paragraph 1 and employ the verb "perform," confirm that the term "performance," contrary to Schneider Electric's contention, extends only to the tasks that NCS was to complete. Paragraph 2 of the bond states:

> If [NCS] **performs the Construction Contract**, [Western Surety] and [NCS] shall have no obligation under this Bond, except to participate in conferences as provided in Subparagraph 3.1.

(Emphasis added.)

Subparagraph 3.1 of the bond, in turn, provides:

> If there is no [default by Schneider Electric], [Western Surety's] obligation under this Bond shall arise after . . . [Schneider Electric] has notified [NCS] and [Western Surety] . . . that [Schneider Electric] is considering declaring a [default by NCS] and has requested and attempted to arrange a conference with [NCS] and [Western Surety] to be held not later than fifteen days after receipt of such notice **to discuss methods of performing the Construction Contract**. If [Schneider Electric], [NCS] and [Western Surety] agree, [NCS] shall be allowed a reasonable time **to perform the Construction Contract**, waive [Schneider Electric's] right, if

19

any, subsequently to declare but such an agreement shall not a [default by NCS.]

(Emphasis added.)

In sum, NCS' obligation to "perform," as set forth in paragraph 2 and subparagraph 3.1 of the bond, refers to the performance of the work it agreed to complete and not to every contractual provision in the incorporation-by-reference chain, which runs from the Master Subcontract Agreement, between Schneider Electric and NCS, to the subcontract between those two parties, to the performance bond, issued by Western Surety. We therefore conclude that the "joint and several" obligation clause in paragraph 1 of the performance bond does not evince Western Surety's assent to be bound by the arbitration clause in the incorporated-by-reference chain of documents, particularly as it was not a party to either of the two earlier contractual links in that chain, namely, the Master Subcontract Agreement and the subcontract that followed.

**B.**

We turn now to consider whether the language in paragraph 1 of the bond, providing that the "Construction Contract [which, as noted earlier, includes the Master Subcontract Agreement, with its arbitration clause] . . . is incorporated herein by reference," compels Western Surety to submit to the arbitration clause of that Agreement. In *Scarlett Harbor I*, *supra*, 109 Md. App. 217, this Court specifically addressed the question whether a non-signatory surety on a performance bond, which incorporated by reference a construction contract (containing an arbitration clause) between a developer of a

20

condominium project and one of its subcontractors, could compel the developer to arbitrate its dispute with the surety.

That case arose from complaints by unit owners alleging defective design and construction of a high-rise condominium development, Scarlett Place Residential Condominium. *Id.* at 229. Those complaints led the council of unit owners of the condominium to file a civil action, in the Circuit Court for Baltimore County, against the project developer, Scarlett Harbor Associates Limited Partnership ("SHALP"), its general partners, and its former general partners, "asserting breach of the statutory implied warranty, breach of express warranty, breach of contract, and violation of the Maryland Consumer Protection Act." *Id.* The defendants, in turn, impleaded several other entities, including a subcontractor, Leonard A. Kraus, Inc., and Hartford Accident and Indemnity Company, which had issued Kraus's performance bond. *Id.*

Because the subcontract between SHALP and Kraus contained a broadly worded arbitration clause,[10] which, as this Court explained, "entitled Kraus to require arbitration to

---

[10] The arbitration clause at issue in *Hartford Accident and Indemnity Co. v. Scarlett Harbor Associates Ltd. Partnership*, 109 Md. App. 217 (1996) (*Scarlett Harbor I*), *aff'd*, 346 Md. 122 (1997) (*Scarlett Harbor II*), provided:

> All claims, disputes and other matters in question between the Contractor [Kraus] and the Owner [SHALP] arising out of or relating to the Contract Documents or the breach thereof . . . shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. . . . No arbitration shall include by consolidation, joinder, or in any other manner, parties other than the Owner, the Contractor and any other persons

21

resolve any 'claims, disputes, [or] other matters . . . arising out of or relating to the Contract Documents or breach thereof,'" Kraus filed a petition, in the Baltimore County circuit court, to compel the SHALP defendants to submit to arbitration. *Id.* at 289. Though Hartford was not a party to the subcontract between SHALP and Kraus, Hartford also filed a petition, in the same court, to compel arbitration, asserting its right to invoke the subcontract's arbitration clause, because the performance bond it had issued incorporated the subcontract by reference.[11] *Id.* at 292. The circuit court granted Kraus's petition but denied Hartford's, "ruling that the performance bond contract did not contain an arbitration agreement" for Hartford to invoke and that Hartford was not a party to the subcontract, which did. *Id.* at 289.

In affirming that ruling, this Court observed that "[w]hen an earlier document is 'incorporated by reference' into a subsequent contract, it simply means that the earlier

---

substantially involved in a common question of fact or law, whose presence is required if complete relief is to be accorded in the arbitration.

*Id.* at 288.

[11] The performance bond contained the following provision:

**Whereas,** Principal [Kraus] has by written agreement dated 8/12/86 entered into a subcontract with Obligee [SHALP] for Renovation and addition to Scarlett Seed Building—Light Gauge Metal Framing (Scarlett Place Phase II & III) in accordance with drawings and specifications prepared by Meyers & D'Aleo which subcontract is by reference made a part hereof, and is hereinafter referred to as the subcontract.

*Scarlett Harbor I*, 109 Md. App. at 289.

22

document is made a part of the second document, as if the earlier document were fully set forth therein." *Id.* at 292 (citations omitted). But, we then stressed that the mere "incorporation of one contract into another contract involving different parties does not automatically transform the incorporated document into an agreement between the parties to the second contract," unless there is "an indication of a contrary intention" to do so. *Id.* We therefore rejected Hartford's contention that such "an indication" was evident, noting that the purpose of the incorporation-by-reference bond language was "simply to establish the primary obligation on which Hartford's secondary obligation would depend." *Id.* And, then, we noted that, even if the arbitration clause were incorporated into the bond, that clause "only require[d] arbitration of disputes between Kraus and SHALP, not Hartford and SHALP," *id.*, much like, as we shall see, the arbitration clause at issue here, which expressly requires the arbitration of disputes between Schneider Electric and NCS but not disputes between Schneider Electric and Western Surety.

Moreover, the bond in *Scarlett Harbor*, like the bond in the instant case, contained a clause that, in the Court's words, "indicate[d] an intention to *litigate* disputes." *Id.* at 293. That clause stated: "Any suit under the bond must be instituted before the expiration of two years from the date on which final payment under the subcontract falls due." *Id.* Because Hartford's interpretation of its bond would have read those words out of the contract, the *Scarlett Harbor I* Court rejected that construction, on the grounds that "a contract should not be interpreted in a manner in which a meaningful part of the agreement is disregarded." *Id.* (citations omitted).

23

It is true, as Schneider Electric points out, that the Court of Appeals, in affirming this Court's decision in *Scarlett Harbor I*, expressly declined to say whether its holding would apply to the specific question presented in this case, namely, whether a surety could be compelled to arbitrate, on the grounds that, in issuing a bond that incorporated by reference a contract, with an arbitration clause, it had agreed "to arbitrate claims on the bond." *Scarlett Harbor II*, 346 Md. at 129 n.7. Nonetheless, when the same principles of Maryland contract law that were invoked by this Court, in *Scarlett Harbor I*, are applied to the bond and other contractual documents at issue here, we are compelled to reach a conclusion that logically follows the holding of the Court of Appeals in *Scarlett Harbor II* — that is, that Western Surety is not compelled to arbitrate any dispute involving the performance bond it issued, simply because that bond incorporated by reference an agreement, to which it was not a party, containing a mandatory arbitration clause.

As we noted in *Scarlett Harbor I*, the "incorporation of one contract into another contract involving different parties does not automatically transform the incorporated document into an agreement between the parties to the second contract," unless there is "an indication of a contrary intention" to do so. *Scarlett Harbor I*, 109 Md. App. at 292. In the instant case, there is no indication of such a "contrary intention."

Moreover, as in *Scarlett Harbor I*, the performance bond, in the instant case, "actually indicates an intention to *litigate* disputes." 109 Md. App. at 293. Paragraph 9 of the bond states:

> **Any proceeding, legal or equitable, under this Bond may be instituted in any court** of competent jurisdiction in the location in which the work or part of the work is located **and**

24

**shall be instituted within two years** after Contractor default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

(Emphasis added.)

In rejecting the argument made, in *Scarlett Harbor I*, that an incorporation-by-reference clause in a performance bond must be construed as providing that the surety and the parties to the construction contract all agreed to be bound to an arbitration clause in that construction contract, we declared that such a reading of the bond would, in effect, read out of it a provision, which provided that "[a]ny suit under the bond must be instituted before the expiration of two years from the date on which final payment under the subcontract falls due." *Scarlett Harbor I*, 109 Md. App. at 293. And, that is precisely what would occur here were we to hold that, notwithstanding paragraph 9's express direction that relief must be sought in the courts of this State, mandatory arbitration of disputes arising under the performance bond was required.

Finally, we note that Schneider Electric's contention that we should follow the majority of courts in other jurisdictions, holding that a surety, which has agreed to the incorporation by reference of a prior contract, containing an arbitration clause, into a bond at issue is thereby bound to arbitrate any disputes with the bond's obligee, is unpersuasive. First of all, the analysis in those cases, as the Court of Appeals observed in *Scarlett Harbor II*, "does not go beyond the fact that the contract containing an arbitration provision has been incorporated into the bond." *Scarlett Harbor II*, 346 Md. at 129 n.7. Indeed, the first

25

two of the cases, cited by the Court of Appeals as lacking any substantive analysis under the law of contracts, *United States Fidelity & Guar. Co. v. West Point Constr. Co.*, *supra*, 837 F.2d 1507 (11th Cir.1988) (per curiam), and *Exchange Mut. Ins. Co. v. Haskell Co.*, *supra*, 742 F.2d 274, 275-76 (6th Cir.1984) (per curiam), are two of the principal cases upon which Schneider Electric relies in this appeal. Those and the other cases,[12] cited by Schneider Electric, are not only short on substance, but shy of analysis. Indeed, had we not been provided, by *Scarlett Harbor I*, with the analytic framework we now employ and, consequently, forced to look outside of Maryland for persuasive authority, we would rely upon the decisions of the United States Court of Appeals for the Eighth Circuit, in *AgGrow Oils, LLC v. Nat. Union Fire Ins. Co.*, 242 F.3d 777 (8th Cir 2001), and *Liberty Mut. Ins. Co. v. Mandaree Pub. Sch. Dist. #36*, 503 F.3d 709 (8th Cir 2007),[13] which are the only federal decisions (out of all of the cases cited by the parties) to correctly apply state contract law to the question of whether an agreement to arbitrate exists and also, in our view, correctly held that, under the circumstances, a bond's mere incorporation by reference of a

---

[12] *Commercial Union Ins. Co. v. Gilbane Building Co.*, 992 F.2d 386, 388-89 (1st Cir. 1993); *Tower Ins. Co. of N.Y. v. Davis/Gilford*, 967 F. Supp. 2d 72 (D.D.C. 2013); *Developers Sur. and Indem. Co. v. Resurrection Baptist Church*, 759 F. Supp. 2d 665 (D.Md 2010); *U.S. Surety Co. v. Hanover R.S. Ltd. P'ship*, 543 F. Supp. 2d 492 (W.D.N.C. 2008); *Transamerica Premier Ins. Co. v. Collins & Co., Gen. Contractors, Inc.*, 735 F. Supp. 1050 (N.D.Ga. 1990); *Hoffman v. Fid. and Deposit Co. of Md.*, 734 F. Supp. 192 (D.N.J.1990); *Cianbro Corp. v. Empresa Nacional de Ingenieria y Technologia, S.A.*, 697 F. Supp. 15 (D.Me. 1988).

[13] The performance bond at issue in *Liberty Mut. Ins. Co. v. Mandaree Pub. Sch. Dist. #36*, 503 F.3d 709 (8th Cir 2007), like the one at issue here, was an AIA form A312 bond. *See Liberty Mut. Ins. Co. v. Mandaree Pub. Sch. Dist. #36*, 459 F. Supp. 2d 866, 868 (D.N.D. 2006), *aff'd*, 503 F.3d 709.

contract, containing an arbitration clause, did not obligate the issuer of that bond to arbitrate.

**MOTION TO DISMISS DENIED. JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLANT.**